(No. 53240.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. HERNANDO WILLIAMS, Appellant.

*Opinion filed May 27, 1983.—Rehearing
denied September 30, 1983.*

254

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Kevin Sweeney, Assistant State's Attorney, of counsel), for the People.

Steven Clark and Ralph Ruebner, Deputy Defenders, and Kenneth L. Jones, Assistant Appellate Defender, of the Office of the State Appellate Defender of Chicago (Martin Carlson, Assistant Appellate Defender, of counsel), for appellant.

JUSTICE WARD delivered the opinion of the court:

After his pretrial motions had been denied, Hernando Williams changed his plea to guilty in the circuit court of Cook County to charges of murder, armed robbery, rape and aggravated kidnaping. The pleas were accepted and judgment was entered upon them. The State then asked for the death penalty, and after a bifurcated sentencing proceeding before a jury and the judge who had accepted the pleas, the defendant was sentenced to death on the murder conviction. He was sentenced to concurrent terms of 30 years for armed robbery and aggravated kidnaping. He was sentenced to 60 years for rape, but that sentence was ordered to run consecutively to a prior 30-year sentence for rape. The circuit court denied a motion by the defendant to vacate the pleas of guilty, and the defendant has taken a direct appeal to this court under the Constitution of Illinois (Ill. Const. 1970, art. VI, sec. 4(b)) and under our Rule 603 (73 Ill. 2d R. 603).

According to testimony given at the sentencing hearings and at an earlier motion to suppress statements of the defendant, the victim, Mrs. Linda Goldstone, on March 30,

1978, was employed at Northwestern Memorial Hospital in Chicago as an instructor in the Lamaze method of childbirth. On that evening, as she was alighting from her car in the vicinity of the hospital, she was approached by the defendant and robbed at gunpoint. He made her undress from the waist down. He then forced her into his car and, it appears, took her to a shop owned by his father. There he bound her hands and feet.

He then forced her into the trunk of his car. With Mrs. Goldstone in the trunk, the defendant picked up his sister at work and drove her home. He then drove the victim to a motel, forced her inside and raped her.

On the next day, with Mrs. Goldstone bound and locked in the trunk of the car, the defendant appeared at a suburban court where charges of aggravated kidnaping, rape, and armed robbery were pending against him. The case was continued, and the defendant then drove to visit a friend, Nettie Jones, at her apartment. While he was there, people of the area heard cries for help coming from the trunk of his auto. Someone notified the police of the incident. The defendant drove away from a crowd that had gathered and proceeded to a tavern where he visited other friends.

Early that evening, the defendant checked into another motel. He forced Mrs. Goldstone into the motel and again raped her. Later, he forced her back into the trunk and picked up his niece at a friend's house and drove the niece home. As he had done the day before, he drove his sister home from work and spent the evening visiting various taverns with friends.

In the meantime, police were searching for the defendant's car. The victim's husband, Dr. James Goldstone, a physician, after learning that his wife had not appeared for class that evening, notified the police of her absence. The victim's car was found by Northwestern University secu-

rity officers. Early the following morning, Dr. Goldstone received a phone call from his wife in which she told him that she would be home soon. He heard a voice in the background say, "Shut up bitch, tell him you'll be home in about an hour." The victim asked Dr. Goldstone if he had called the police, and he told her to tell the man whose voice he had heard that he had not informed the police.

Officers investigating the incident at Jones' apartment obtained the license number of the car and learned that the defendant had visited Jones. The police searched the area for the auto without success and periodically watched the defendant's home, but the car was not located.

On April 1, at 6 a.m., the defendant released the victim from the trunk of the auto. He gave her $1.25 and instructed her to take a bus home and not to call the police. He then drove off. The victim, ignoring his instructions, ran to the porch of a nearby house for help. The person who came to the door refused to allow her to enter, but he did call the police. The defendant, who had only driven around the block to see whether his instructions would be obeyed, returned and ordered the victim off the porch. He then took her to an abandoned garage and killed her, shooting her in the chest and head. There was medical evidence that the victim had been beaten once or more during her captivity.

The defendant was arrested at his home that afternoon while he was washing the trunk of his car. Early the next morning he gave a statement that was transcribed by a court reporter. In the statement, the defendant admitted to kidnaping, robbing and shooting the victim.

A number of the contentions of the defendant concern the constitutionality of the death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). The issues raised have been decided adversely to him in recent holdings of this court, and there is no necessity of discussing them in detail now.

This court has a number of times held that the grant of discretion to the prosecutor under the statute to ask for the death penalty is not unconstitutional. (*E.g., People v. Davis* (1983), 95 Ill. 2d 1, 28; *People v. Szabo* (1983), 94 Ill. 2d 327, 351.) Too, we have held that there is no unconstitutional vagueness in the statutory provision that the court sentence the defendant to death if the jury determines that "there are not mitigating factors sufficient to preclude the imposition of the death sentence" (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(g)), or in the provision that the absence of a "significant history of prior criminal activity" (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(1)) is a mitigating factor. *People v. Lewis* (1981), 88 Ill. 2d 129, 144-46.

This court also has held that the sentencing standards in the death penalty statute, which provide for the weighing of mitigating factors against aggravating factors, do not offend due process. In *People v. Brownell* (1980), 79 Ill. 2d 508, 528-34, this court rejected a contention that the statute is constitutionally inadequate because it does not set out specific standards as to the weight to be given to the aggravating and mitigating factors. Because the sentencing process upheld in *Brownell* is a weighing process, we have judged that there is no need to impose a specific burden of proof upon the prosecution to show the absence of mitigating factors. (*People v. Free* (1983), 94 Ill. 2d 378, 421.) We have also rejected the contention that the statute is unconstitutional in permitting the jury to consider in the second phase of the sentencing proceeding nonstatutory aggravating factors (*People v. Kubat* (1983), 94 Ill. 2d 437, 504), and we have distinguished *Henry v. Wainwright* (5th Cir. 1981), 661 F.2d 56, *cert. allowed and cause remanded* (1982), 457 U.S. 1114, 73 L. Ed. 2d 1326, 102 S. Ct. 2922, which the defendant here cites for his argument to the contrary. *People v. Davis* (1983), 95 Ill. 2d 1, 38; *People v. Free* (1983), 94 Ill. 2d 378, 427.

Too, we have rejected the argument that the sentencing scheme is defective in failing to provide procedures for comparative review. That review would entail providing for the collection of data in all murder cases in this State for a comparison between cases in which the death penalty has been imposed and those in which it was not. (*People v. Kubat* (1983), 94 Ill. 2d 437, 502-04.) Further, we have judged that the statute does not violate article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 11), which provides that all penalties be determined in accordance with the seriousness of the offense and with the goal of restoring the offender to useful citizenship. *People v. Davis* (1983), 95 Ill. 2d 1, 28; *People v. Free* (1983), 94 Ill. 2d 378, 420-21; *People v. Szabo* (1983), 94 Ill. 2d 327, 351; *People v. Gaines* (1981), 88 Ill. 2d 342, 380-82.

The defendant also contends that his rights under the sixth amendment (U.S. Const., amend. VI) were violated by the trial judge's refusal to allow him to serve as co-counsel. Prior to entering the plea of guilty, the defense presented a motion asking that the defendant be allowed to serve as co-counsel at trial. The defendant said that he wanted "to represent [himself] with counsel." According to his attorney, the defendant desired to conduct some parts of the trial himself. He did not want to appear *pro se* with a lawyer in an advisory role. The court denied the motion and required the defendant to choose between representing himself or being represented by counsel. The defendant chose to have counsel represent him.

The State contends that this question is moot and has been waived, because the defendant did not go to trial. He pleaded guilty. Whether the issue is moot or not it is clear that it has no merit. In *People v. Ephraim* (1952), 411 Ill. 118, a defendant claimed that his right to defend himself *pro se* was denied by a judge's appointment of counsel in his behalf. The trial court had initially granted the defendant leave to conduct his own defense when the public defender who had been representing him withdrew from the

case. Later, however, the trial court, on its own motion, appointed counsel, who represented the defendant at pretrial hearings, at trial, and in post-trial motions.

This court's review of the record showed that the defendant had accepted counsel without making any objection. The acceptance of counsel, this court judged, was a waiver of the right to appear *pro se*. It explained:

"An accused has either the right to have counsel act for him or the right to act himself. As pointed out in *United States v. Mitchell* [(2d Cir. 1943), 137 F.2d 1006], it is obvious that both of those rights cannot be exercised at the same time. It follows that to allow a defendant to avail himself to the hilt of his right to counsel, then allow him to plead his right to defend himself when the trial conducted by counsel produces an unsatisfactory result, would give far too great a chance to delay trial and to otherwise embarrass effective prosecution of crime. (See *United States v. Gutterman* [(2d Cir. 1945), 147 F.2d 540].) As indicated in the *Mitchell* case, a defendant must be required to make his election between the two rights at the proper time and in the proper manner." *People v. Ephraim* (1952), 411 Ill. 118, 122.

There is no reason to depart from the holding in *Ephraim* that a defendant has no right to both self-representation and the assistance of counsel. Federal courts have held that no such right exists under the United States Constitution (*United States v. Halbert* (9th Cir. 1981), 640 F.2d 1000, 1009; *United States v. Daniels* (5th Cir. 1978), 572 F.2d 535, 540), and the provision in our constitution regarding the right of self-representation and the assistance of counsel is identical in relevant part to the corresponding provision in the constitution in effect when *Ephraim* was decided. Compare Ill. Const. 1970, art. I, sec. 8, with Ill. Const. 1870, art. II, sec. 9.

The defendant argues that his plea of guilty was not entered voluntarily and intelligently. Due process requires that a plea of guilty not be accepted unless it appears from the record that the plea was made knowingly, intelligently

and voluntarily. (*Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709.) To satisfy the requirements of due process, our Rule 402 (73 Ill. 2d R. 402) provides in part:

"In hearings on pleas of guilty, there must be substantial compliance with the following:

(a) Admonitions to Defendant. The court shall not accept a plea of guilty without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences;

(3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made, or to plead guilty; and

(4) that if he pleads guilty there will not be a trial of any kind, so that by pleading guilty he waives the right to a trial by jury and the right to be confronted with the witnesses against him."

The defendant contends that his right to due process was violated because when he entered his plea of guilty he "did not and could not have known the maximum penalty that his plea could subject him to."

This contention is simply not supported by the record. At the time the defense announced that the defendant wanted to change his initial plea of not guilty to guilty, the court informed the defendant of the charges against him. The court then said: "I must advise you further that you can be tried before this court or before a jury. If you are found guilty of murder, under the circumstances of which case [*sic*] the death penalty could be imposed." The court also informed the defendant of the prison terms he could be given for the other offenses.

The prosecutor requested, "I ask that the defendant also be admonished as to the amount of years he could get

on the charge of murder and that he might be eligible for a life imprisonment in addition to the death penalty, your Honor, as a possible penalty \*\*\*." The court then stated, "I must also advise you [that] in addition to the possibility of the death penalty under the Code as it exists in the State of Illinois, there is a further provision for the imposition of sentence for the crime of murder wherein it is provided the minimum term to be imposed shall be not less than 20 years and not more than 40 years." The court advised the defendant that by pleading guilty he was waiving his right to have a jury determine the question of guilt. The defendant signed a waiver stating that he was foregoing his right to a jury trial and that he was pleading guilty to the charges.

It is clear that the defendant was advised of the possibility that the death penalty could be imposed. The defendant contends that the judge's language admonishing him that he could receive the penalty after being found guilty of murder implied that the death penalty could be imposed only after a trial, not upon a plea of guilty. This contention is not convincing. An admonition of the court must be read in a practical and realistic sense. The admonition is sufficient if an ordinary person in the circumstances of the accused would understand it to convey the required warning. (*People v. Krantz* (1974), 58 Ill. 2d 187, 193; *People v. Doyle* (1960), 20 Ill. 2d 163, 167.) The defendant could not reasonably have understood that by waiving the determination of guilt by the trial court or by a jury he would avoid the imposition of the death penalty.

Moreover, there is no doubt that the defendant was aware that he was eligible for the death penalty even before he announced his intention to change his plea to guilty. Months before the plea of guilty was entered the defense filed a motion asking the State to disclose whether the death penalty would be sought. In open court, and in the presence of the defendant, the State answered that it

need not make an announcement at that time. Too, on the morning that the plea of guilty was entered, the defense presented a written motion to compel disclosure of the aggravating factors the prosecution would introduce at a death penalty hearing. The defendant, prior to acceptance of his plea, acknowledged to the judge that his attorneys had informed him of the consequences of pleading guilty.

Another contention made by the defendant is that his sentence must be vacated because in reaching its verdict the jury relied upon an aggravating factor not in evidence. One of the statutory aggravating factors relied upon by the prosecution was that "the murdered individual was killed in the course of another felony." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6).) The other factor relied upon was that "the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7).) Here, as he did in the trial court, the defendant contends that reliance upon the second factor should not have been permitted.

The defendant bases this argument upon *People v. Brownell* (1980), 79 Ill. 2d 508. There the defendant was found guilty of murder, aggravated kidnaping and rape, and was sentenced by the court. The court found that under the evidence two aggravating factors were present: (1) that the victim was killed in the course of two other felonies, (2) that the victim was an eyewitness against the defendant. Finding no mitigating factors to preclude the sentence of death, the court sentenced the defendant to death.

According to Brownell's written statement admitted at trial, the defendant had picked up the victim, Louise M. Betts, when she was hitchhiking. Armed with a knife, the defendant drove to an open area and raped the victim. The

defendant then attempted to strangle her, but she was able to get up and run from him. The defendant caught and strangled her.

This court judged that the second aggravating factor found by the court, that the victim was an eyewitness against the defendant, was not established. It pointed out that the trial judge apparently made the finding that the victim was an eyewitness simply on the ground that the victim could have later testified against the defendant as to the aggravated kidnaping and rape. This court explained that while the circumstances met the literal requirements of the aggravating factor, the General Assembly must not have intended that aggravating factor to be applied to such a case. The court said:

"Otherwise, were we to adopt the trial court's finding, this aggravating factor could apply in every prosecution for murder where another offense contemporaneously occurs because the victim could have been a witness against the defendant. Or, even more broadly, this aggravating factor could apply to every prosecution for murder since every victim, obviously, is prevented from testifying against the defendant. We do not think the General Assembly intended the death penalty to be applied in every murder case, and, if it did, the General Assembly could certainly find a more direct way to express its intent than through this aggravating factor." (*People v. Brownell* (1980), 79 Ill. 2d 508, 526.)

This court concluded that the General Assembly must not have intended the aggravating factor to be applied to a victim who was, or who may be, a witness as to the offenses in the course of the murder. Instead, it must have been the legislature's intent "to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution." 79 Ill. 2d 508, 526.

We think that the circumstances here are sufficiently

different from those in *Brownell* to permit us to reach a different conclusion. Here, the evidence showed that after kidnaping and raping the victim, the defendant set her free with instructions to go directly home and not to call the police. She did not obey, however, and went to a house for help. The owner of the house told her he would call the police for her and he did so. The defendant was actually secretly watching her, and he then took her off and murdered her. The police were on their way to the scene in response to the resident's phone call at the time of the killing.

By his own admission, the defendant acted as he did because he knew Mrs. Goldstone was going to report the crimes to the police. A police investigator testified to a statement made by the defendant:

"He said all right, that he would talk, that he didn't want to hurt Mrs. Goldstone, that he intended to leave her go, and that he in fact let her go on her promise that she would not go to the police. When he saw her go up to the door at 104th and Maryland, he realized there was no way that she wasn't going to go to the police."

In a statement transcribed by a court reporter, the defendant said:

"I drove further up the way on the same street and I got out of my car and I walked around the corner on 104th Street and I could see up to the next corner, which is Maryland. I saw her on somebody's porch and she was talking to somebody, you know, call the police, you know, this and that, whoever she was talking to."

Under these circumstances, the jury could have found both that the murder was committed "in the course" of the other felonies, and that the victim was an eyewitness. There is no significant difference between the circumstances here and a situation in which a defendant kidnaps and rapes the victim, sets her free, and at a later time kills her while she is on her way to testify against him. The latter situation clearly is within this court's understanding of

the statute considered in *Brownell.* We do not see why the General Assembly would not have intended the circumstances here to be within the statutory factor. The legislature's clear concern, to protect persons who could assist in the apprehension and prosecution of the accused (see Remarks of Senator Knuppel, debate of amendment 3 to H.B. 10, 80th Gen. Assem., June 1, 1977, at 21-25), is served by such an interpretation.

The defendant's next argument concerns the State's exercise of peremptory challenges. Here the victim and most of the prosecution's witnesses were white and the defendant was black. According to a motion filed by the defendant to discharge the jury selected, 28 of the 130 prospective jurors examined and excused during the *voir dire* examination were black. Fifteen of the prospective black jurors were excused for cause on the State's motion and two were excluded for cause on the defendant's motion. The State used 11 peremptory challenges to exclude the other blacks.

The defendant argued in his motion that his rights under the sixth and fourteenth amendments were violated by the State's exercise of the peremptory challenges. He contends that the court erred by not requiring the prosecution to show a justification, as the defendant puts it, for the peremptory challenges other than that of race.

The defendant's briefs in this court in addition contain statements regarding the composition of 43 juries in recent capital cases in this State. Over half of the juries were all white. Most of the rest of the juries contained only one black. How many peremptory challenges were exercised by the defense and by the State is not indicated. There are no other materials to illustrate that the State has regularly and systematically through the exercise of peremptory challenges excluded blacks or other minorities in case after case. None of these materials, it would appear, were presented to the trial court.

In *People v. Davis* (1983), 95 Ill. 2d 1, we rejected a contention by the defendant that the State's exercise of peremptory challenges which resulted in an all-white jury deprived the defendant of a fair and impartial jury. We noted that the contention was contrary to *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, in which the Supreme Court held that an exercise of peremptory challenges which resulted in the selection of a jury composed of white jurors did not of itself show a constitutional violation. Under *Swain,* a constitutional issue of equal protection could not arise unless there was a systematic and purposeful exclusion of blacks because of race from juries in case after case. 380 U.S. 202, 223, 13 L.Ed. 2d 759, 774, 85 S. Ct. 824, 837.

We noted too in *Davis* that though two States have not followed *Swain* when interpreting provisions of their constitutions (*Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170; *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890), we would adhere to the Supreme Court's view.

The defendant here cites another decision, in which the exclusion of blacks through the use of peremptory challenges was held to be a violation of Federal constitutional law. That case, *People v. Payne* (1982), 106 Ill. App. 3d 1034, was decided by the third division of the First District of the appellate court. It was held that the use of peremptory challenges by the State to exclude blacks from a jury during *voir dire* because they are black is a violation of the defendant's right to a jury drawn from a fair cross section of the community. The *Payne* court relied upon *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, in which the Supreme Court held that it is fundamental to the sixth amendment guarantee of an impartial jury that "the defendant in a criminal trial [have] the opportunity to have the jury drawn from venires representa-

tive of the community." (419 U.S. 522, 537, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701.) The court in *Taylor* judged that the Louisiana jury system violated this fair-cross-section requirement because under the system a woman would not be selected for jury service unless she had previously filed a written declaration expressing her desire to serve as a juror, which system resulted in women being called for jury service in grossly disproportionate numbers considering the number of eligible women in the community.

The court in *Payne* believed that the use of peremptory challenges in particular cases to exclude members of any discrete group because of their group affiliations also was invalid, because otherwise "the constitutional right to a jury drawn from a fair cross section of the community could be rendered a nullity through the use of peremptory challenges." (*People v. Payne* (1982), 106 Ill. App. 3d 1034, 1037.) The *Payne* court said that *Swain* was not controlling in the circumstances because in *Swain* the defendant's challenge was based upon the equal protection clause in the fourteenth amendment, not upon the sixth amendment. The *Payne* court noted that *Swain* was decided before the Supreme Court held that the sixth amendment rights relating to jury trials were applicable to the States, and before the court in *Taylor* held that the fair-cross-section requirement was a guarantee of the sixth amendment. 106 Ill. App. 3d 1034, 1040-43.

The division of the appellate court that decided *Payne* has followed its decision in subsequent cases. (*People v. Gilliard* (1983), 112 Ill. App. 3d 799; *People v. Gosberry* (1982), 109 Ill. App. 3d 674.) *Payne* has been considered and rejected, however, by two other divisions of that court. *People v. Newsome* (1st Dist., 2d Div. 1982), 110 Ill. App. 3d 1043; *People v. Teague* (1st Dist., 1st Div. 1982), 108 Ill. App. 3d 891.

*Payne* does not satisfactorily meet the questions which

must be addressed in considering the problem.

The Supreme Court in *Swain* concluded that the importance of the peremptory challenge in obtaining an unbiased jury justified its use in particular cases against members of individual groups based on their group affiliations. The court stated:

"In providing for jury trial in criminal cases, Alabama adheres to the common-law system of trial by an impartial jury of 12 men who must unanimously agree on a verdict, the system followed in the federal courts by virtue of the Sixth Amendment. As part of this system it provides for challenges for cause and substitutes a system of strikes for the common-law method of peremptory challenge. Alabama contends that its system of peremptory strikes—challenges without cause, without explanation and without judicial scrutiny—affords a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial. This system, it is said, in and of itself, provides justification for striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes. Based on the history of this system and its actual use and operation in this country, we think there is merit in this position." *Swain v. Alabama* (1965), 380 U.S. 202, 211-12, 13 L. Ed. 2d 759, 767-68, 85 S. Ct. 824, 831.

The court then traced the history of the peremptory challenge and found that it had "very old credentials." (380 U.S. 202, 212, 13 L. Ed. 2d 759, 768, 85 S. Ct. 824, 831.) Its function, the court explained, is to eliminate extremes of partiality on both sides and to assure the parties that the jurors will decide the case on the evidence alone. The availability of peremptories, the court pointed out, permits counsel to ascertain the possibility of bias through probing questions at *voir dire,* and it removes the fear of arousing a juror's hostility through examination and challenge for cause. The court also noted that "[a]lthough historically the incidence of the prosecutor's challenge has differed from

that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' " 380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 835, quoting *Hayes v. Missouri* (1887), 120 U.S. 68, 70, 30 L. Ed. 578, 580, 7 S. Ct. 350, 351.

The court concluded:

"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. \*\*\* It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' [citation], upon a juror's 'habits and associations' [citation], or upon the feeling that 'the bare questioning [a juror's] indifference may sometimes provoke a resentment' [citation]. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. It is well known that these factors are widely explored during the *voir dire,* by both prosecutor and accused [citations]. This Court has held that the fairness of trial by jury requires no less. [Citation.] Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged with-

out cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. ***

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." 380 U.S. 202, 220-22, 13 L. Ed. 2d 759, 772-73, 85 S. Ct. 824, 836-37.

We consider that the authority of *Swain* was not lessened because of the recognition of a sixth amendment fair-cross-section requirement in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692. The court in *Taylor* held that it is fundamental to the sixth amendment right to a jury trial that the selection of a petit jury be from a representative cross section of the community. The issue, as the court put it, was, "whether the presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." 419 U.S. 522, 526, 42 L. Ed. 2d 690, 696, 95 S. Ct. 692, 696.

There was no retreat in the *Taylor* opinion from the view that it is an essential part of our system of trial by an impartial jury that both sides be allowed in particular cases to exercise peremptory challenges on any ground they select. It appears that the complaint addressed in *Taylor* is the systematic exclusion of a group from the jury system, not from any particular jury. This is in harmony with the suggestion in *Swain* that the systematic exclusion of blacks by peremptory challenges in case after case regardless of the particular circumstances involved would raise a constitutional issue. (380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837.) Moreover, the limited character of the *Taylor* holding is clear from the following statement, which

appears at the conclusion of the opinion:

> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition [citation]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. 522, 538, 42 L. Ed. 2d 690, 702-03, 95 S. Ct. 692, 702.

The Court of Appeals of New York recently rejected a request that it no longer follow the holding of the Supreme Court in *Swain*. The court made clear its understanding that the holding in *Swain* had not been affected by *Taylor*:

> "The issue of minority representation on criminal juries has been the subject of several decisions by the Supreme Court. These decisions draw a critical distinction between the jury pool, which is the group of prospective jurors from which the litigants will select a jury to hear their particular case, and the jury that is ultimately chosen to serve. The Sixth Amendment requires that the jury pool be selected from a representative cross section of the community (*Taylor v. Louisiana* [(1975)], 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692), and distinctive groups in the community may not be systematically excluded from the pool. Once the jury pool is selected, however, prospective jurors may then be excluded through the exercise of cause challenges and peremptory challenges." (*People v. McCray* (1982), 57 N.Y.2d 542, 545, 443 N.E.2d 915, 916-17, 457 N.Y.S.2d 441, 442-43, *cert. denied* (1983), 461 U.S. ____, 77 L. Ed. 2d 1322, 103 S. Ct. 2438.)

Even the court in *People v. Wheeler* (1978), 22 Cal. 3d 258, 284-85, 583 P.2d 748, 767, 148 Cal. Rptr. 890, 908, which we referred to earlier, recognized that if the Supreme Court were presented with the issue we are considering in

terms of the sixth amendment fair-cross-section requirement, the court probably would not decide the question differently than it did in *Swain*.

Parenthetically, we would observe that since it was followed in *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *Wheeler* has been followed in few instances. (*E.g., State v. Crespin* (1980), 94 N.M. 486, 612 P.2d 716.) Most courts have declined to follow it (*State v. Stewart* (1979), 225 Kan. 410, 591 P.2d 166; *Lawrence v. State* (1982), 51 Md. App. 575, 444 A.2d 478, *aff'd* (1983), 295 Md. 557, 457 A.2d 1127; *State v. Sims* (Mo. Ct. App. 1982), 639 S.W.2d 105; *Commonwealth v. Henderson* (1981), 497 Pa. 23, 438 A.2d 951; *State v. Ucero* (R.I. 1982), 450 A.2d 809; *State v. Grady* (1979), 93 Wis. 2d 1, 286 N.W.2d 607; see *People v. McCray* (1982), 57 N.Y.2d 542, 443 N.E.2d 915, 457 N.Y.S.2d 441, *cert. denied* (1983), 461 U.S. ___, 77 L. Ed. 2d 1322, 103 S. Ct. 2438 (not mentioning *Wheeler* but rejecting the *Wheeler* approach); *cf. Doepel v. United States* (D.C. 1981), 434 A.2d 449, *cert. denied* (1981), 454 U.S. 1037, 70 L. Ed. 2d 483, 102 S. Ct. 580 (judging *Swain* dispositive)). Two of the courts expressly criticized *Wheeler* as effectively eliminating the peremptory challenge as a useful tool in assuring an impartial jury. *Commonwealth v. Henderson* (1981), 497 Pa. 23, 438 A.2d 951; *State v. Grady* (1979), 93 Wis. 2d 1, 286 N.W.2d 607.

There has been criticism of the reasoning of the *Wheeler* court. (See S. Saltzburg & M. Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation,* 41 Md. L. Rev. 337, 359-60 (1982).) It has been observed that *Wheeler* "has found surprisingly little support" and that "the overwhelming majority of courts still apply *Swain's* systematic exclusion test." Comment, *The Sixth Amendment: Limiting the Use of Peremptory Challenges,* 16 J. Mar. L. Rev. 349, 358 (1983).

Another contention of the defendant is that there was

error in the excusing for cause of certain jurors. In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the Supreme Court held that prospective jurors could not be excused for cause simply because they had scruples against the infliction of the death penalty, or voiced general objections to capital punishment. The court did not hold improper, however, the exclusion of jurors who made it clear that they would automatically vote against the imposition of the death penalty regardless of evidence presented to them. The Supreme Court has not deviated from the rule in *Witherspoon*. The State can "exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths." *Adams v. Texas* (1980), 448 U.S. 38, 48, 65 L. Ed. 2d 581, 592, 100 S. Ct. 2521, 2528.

The defendant claims that the exclusion of 12 prospective jurors was in violation of *Witherspoon*. Our review of the record satisfies us that none of those jurors was excluded simply for expressing general objections to the death penalty.

Contrary to the defendant's contentions, the exclusion of four of the 12 jurors had no reference to the death penalty. Mrs. Jean Samp was not challenged by the State; she was excused at her own request. She believed in capital punishment but she told the court that she had a strong unwillingness to play God as a juror. She said that she honestly felt that she could not be an unbiased juror, and that she would be partial to one side. The court excused her after ascertaining that she could not lay aside her personal opinions and render an impartial verdict on the evidence. Clearly a trial court can excuse a juror who states that she cannot be impartial. *E.g., People v. King* (1973), 54 Ill. 2d 291.

Luella Kentris was excused not because of scruples against the death penalty, but because the court judged that she lacked capacity to understand her duties as a ju-

ror. She gave contradictory answers, and insisted that she would presume that the defendant was innocent despite his plea of guilty. The prospective juror's obvious confusion during questioning justified the court's statement, "I am not aware that she understood any of anyone's questions, *** [or] the nature of the proceedings, despite the fact that it was explained to her by each attorney and by the court, and I'm not aware whether or not she comprehended what was occurring."

Joan Carter was also excused for reasons other than her feelings as to the death penalty. She was not asked about her attitude in that respect. She did state, though, that she did not know whether she could apply the law as instructed in instances where she disagreed with the law. If the law conflicted with her "inner feelings," she said, she would follow her feelings.

Another juror, Lovell Wilkinson, was excused after stating that he could not fairly and impartially serve as a juror. He, in fact, believed in the death penalty, but was upset that it was not applied in every murder case after a finding of guilt.

The restriction upon the exclusion of jurors expressed in *Witherspoon* was not applicable to the above-named jurors. *Witherspoon* does not prohibit the exclusion of jurors who state that they will not be able to follow the law and render an impartial verdict based on the evidence. *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521.

The other jurors were properly excluded for cause. They did express views against capital punishment that would require them, they said, to vote against the death penalty whatever the evidence presented to them might be. Hereafter is the relevant interrogation of these jurors.

Juror Phillip Smith:

"Q. [Prosecutor]: Okay, do you have any conscientious or religious scruples against the imposition of the death

penalty, sir?

A. Yes, I do.

Q. You will be against applying that, is that correct?

A. Yes.

Q. No matter what the evidence says, in other words, right?

A. Yes.

\* \* \*

Q. [Defense Counsel]: Mr. Smith, the attitude you have about the death penalty, is that to the extent that any kind of a case, no matter how severe or how brutal it is?

A. Yes.

\* \* \*

Q. [Defense Counsel]: Can you think of any crime that may come out of the neighborhood that you live in that may be so brutal that the death penalty might be appropriate?

A. No."

Juror Lois Marquez:

"Q. [Prosecutor]: \*\*\* Do you, sir, have any conscientious or religious scruples against the imposition of the death penalty in a proper case?

A. I don't believe in capital punishment.

\* \* \*

Q. [B]ecause of your belief, do you believe that you could never impose capital punishment?

A. I don't think I could.

\* \* \*

Q. So what you are saying is that no matter what evidence would be shown to you, you couldn't impose the death penalty, yes or no?

A. No, I couldn't."

Juror William A. Occomy told defense counsel that he did not consider that he was qualified to serve as a juror in a sentencing proceeding.

"Q. [Defense Counsel]: \*\*\* [C]an you promise me that you will follow the law as the judge instructs you to do so and can you put aside the feeling that this decision is one

that makes you certainly uncomfortable, one that you would prefer not to do?

A. Frankly speaking, no.

Q. You don't feel you can follow the law as the judge gives it to you?

A. Frankly, well, let me put it this way, I guarantee you now, my name will never be on that piece of paper for a death verdict."

Juror Ruthie Norwood:

"Q. [Prosecutor]: All right, do you have any feelings with respect to capital punishment?

A. I don't believe in it.

* * *

Q. Okay; are your feelings of the type that no matter what the evidence in the case showed, you would not be able to vote for capital punishment?

A. Right, I wouldn't.

* * *

Q. [Defense Counsel]: Mrs. Norwood, are you saying that in any case, no matter how extreme, you would not even consider the imposition of the death penalty?

A. I just don't believe in it."

Juror Vincent Ross, a minister, had religious scruples against the death penalty.

"Q. [Prosecutor]: *** [I]s [your religious belief] such that you feel you could not be in a position to sign a verdict that would mandate somebody's death?

A. No, I could not.

Q. No matter what the facts are, when it came right down to it, when they slid the piece of paper over to you, you wouldn't be able to sign it, would you?

A. No.

* * *

THE COURT: Now, this stage before the trial has begun, are you stating that you would not sign a verdict form mandating the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings?

* * *

Is that what you're saying, sir?

THE WITNESS: Yes."

Juror Francis Murray remembered reading about the murder in a newspaper article. In regard to the death penalty issue he said:

"Q. [Defense Counsel]: Mr. Murray, if a verdict form was handed to you that dictated that the death penalty should be applied and you thought the case was a proper one, it should be applied, would you sign such a verdict?

A. I don't think I can live with it.

Q. Do you have—do you feel the death penalty is in fact warranted in a proper case?

A. I don't believe in the death penalty.

Q. Is this belief that you have in the death penalty based upon a religious or moral feeling?

A. It's a moral feeling.

\* \* \*

Q. [Defense Counsel]: When you tell us, Mr. Murray, that you do not believe in the death penalty, are you saying to us that you do not believe the death penalty is ever applicable in any kind of case?

A. No, I don't believe I could judge anybody in a life and death situation. I couldn't."

Juror Mary Lou Hill, after being somewhat vague as to the death penalty in response to questioning by defense counsel, said:

"Q. Do you feel that you would be capable of signing a verdict that would warrant the death penalty in any case?

\* \* \*

A. I think that would be very hard for me to do.

Q. [Prosecutor]: No, that's an equivocal statement. Could you or could you not?

A. The way I feel now, no.

\* \* \*

THE COURT: Ma'am, regardless of the facts and circumstances that might emerge during the course of this hearing, are you, irrevocably, committed before the hearing has begun, to vote against the death penalty?

A. Your Honor, I don't believe in the death penalty.

\* \* \*

Q. Well, then you would answer that question how, yes or no?

A. Would you repeat that question again?

Q. Regardless of the facts or circumstances that might emerge in the course of the proceedings in this case, by you now— are you irrevocably committed against— before the hearing— the death penalty and not to sign a verdict form if that verdict form would mandate?

A. Yes.

Q. That is your opinion right now?

A. Yes."

The parties disagree whether Delores Hudson was excused because of her views against the death penalty. We consider from an examination of the record that she was excused for this reason, but in any event, any possible error in regard to *Witherspoon* was waived. During questioning by defense counsel she stated:

"Q. *** [D]o you have any questions you have to ask me, at this point, about the procedure about what we are about— about what's going to happen in the situation, if you are selected as a juror?

A. Not really, but I would like to say one thing, and I don't know if I has a right to ask, but I have a feeling about the electric chair.

Q. What feelings do you have?

A. I don't like it.

Q. You don't like the electric chair? Miss Hudson, do you feel that in certain cases— or can you conceive of the situation where the death penalty would be an appropriate punishment?

A. I— I— I was always taught thou shall not kill, and I would feel, you know, I would sit there and—no matter what this person done, you know, to me, and I will sit there and write down that the death penalty, and I don't believe in it, you know, killing anybody, and that would be a burden on me, that my vote was in there to do this action, and I don't believe in it, you know.

Q. Well, let me ask you this.

[Prosecutor]: Cause.

[Defense Counsel]: May I—

[Prosecutor]: Motion for cause.

THE COURT: Motion for cause is overruled. Counsel, there is a motion for cause.

[Defense Counsel]: Fine, Judge. May I continue questioning or is the Court going to rule on it this moment?

[Prosecutor]: I think it's sufficient right now. The lady stated, without leading questions, what her feelings are.

[Defense Counsel]: Your Honor, I am questioning, at this point, or is [the prosecutor].

[Prosecutor]: I made my motion, Judge.

[Defense Counsel]: Your Honor, Judge, I am sure you heard [the State's Attorney]. I am sure you heard [the State's Attorney]. He doesn't have to repeat himself.

THE COURT: I think [the prosecutor] has a right—

[Defense Counsel]: After we are done, of course.

THE COURT: All right. Let us move on post haste.

\* \* \*

Q. I am going to try and complete the question, if I am able to.

The State is going to be seeking the death penalty against my client. Would you be able to wait and listen to here [*sic*] all the evidence before you make your decision on whether or not the death penalty should be applied?

[Prosecutor]: Object.

THE COURT: She may answer.

A. THE JUROR: Well, just like I told you, I don't believe in the death chair, so—

[Defense Counsel]: I have no further questions, Judge.

THE COURT: You may step down, ma'am. Thank you.

(Juror is excused)"

In regard to this juror, it is argued that the trial court denied, not allowed, the motion for cause because of her attitude toward the death penalty. While the court at one point in the above excerpt did say that the motion was denied, it is obvious it was a tentative or nonfinal ruling to

permit the questioning by the defense to continue. The court kept the question open and the defense questioning continued. The court's final ruling came after the defense had concluded its questioning. The court recessed, and upon resuming the proceeding stated that she had been excused for cause.

The defense noted an objection to her exclusion for the record, but the ground of the objection was not that she was being excluded in violation of *Witherspoon*. The stated ground of the objection was that the defense did not have a sufficient opportunity to question the prospective juror. A specific objection, of course, waives all grounds not stated. (*Town of Cicero v. Industrial Com.* (1950), 404 Ill. 487, 495; E. Cleary & M. Graham, Illinois Evidence sec. 103.2, at 6 (3d ed. 1979).) The defendant does not assert the "insufficient opportunity" ground here.

The defendant says that as to these jurors, the court did not use the precise language of the *Witherspoon* test of exclusion for cause. Our decisions have stressed, however, that we must look to the substance of the answers given, not simply to whether the form of the questions and answers matched the pattern described in *Witherspoon,* and we recognize the superior position and opportunity of the trial judge to ascertain a juror's meaning. (*People v. Free* (1983), 94 Ill. 2d 378, 402-03; *People v. Kubat* (1983), 94 Ill. 2d 437, 499.) As this court observed in *People v. Gaines* (1981), 88 Ill. 2d 342, 356: "[I]t is appropriate to point out that the distinction drawn in *Witherspoon* between a venireman's general opposition to the death penalty and his unwillingness to vote for its imposition is a sophisticated one which a prospective juror may not readily grasp. While it is the duty of the trial judge to propound the key questions in a form which will be understood and with enough specificity to admit of an unambiguous response, we do not read *Witherspoon* as prescribing a set catechism, or as requiring a venireman to express himself with

meticulous preciseness."

The defendant also complains that a photograph of the victim taken by her husband was highly prejudicial and should not have gone to the jury room at the stage of the proceeding when the jury was deliberating whether to impose the death penalty. During the first stage when it was being determined whether the defendant's conduct had made him liable for the death penalty, the State asked to have the portrait photograph sent into the jury room. A defense objection was sustained on the ground that the photograph might excite sympathy for the victim from the jury and that it did not accurately portray the victim's appearance immediately prior to the crime.

During the second stage of the sentencing hearing, the defendant testified under cross-examination in part:

"Q. Did you notice any changes in her physical condition?

A. Not at that time, no.

Q. Did you notice any bruises on her face?

A. I don't recall looking for any bruises.

Q. You don't recall looking for any? Hernando Williams, how many times did you hit Linda Goldstone in the face?

A. I don't recall hitting her in the face at all.

Q. You don't recall?

A. No, I do not.

Q. Did you hit her at all during the whole 36-hour period of time that you held her in captivity?

A. I could have.

Q. You could have?

A. That's right.

Q. Well, did you see the photographs that the jury saw of the body of Linda Goldstone, her face, showing the bruises?

A. No, I did not see the photographs.

Q. Well, didn't you notice any—at the time that you let her off, did you notice any bruises on her face?

A. No, I don't remember.

Q. You don't remember. Well, did she look the same,

Mr. Williams, as when you first picked her up?

    A. No, she didn't look the same."

After being shown the lifetime photograph of the victim, the defendant was asked:

    "Q. [I]s that the way she looked when you picked her up?

    A. (No response.)

    Q. Her face?

    A. Yes.

    Q. And there was quite a change, wasn't there, from the time that you let her off, right?

    A. There had been some changes, yes."

A photograph of the victim's body at the scene of her murder was sent to the jury room during the second stage of the hearing along with the portrait photograph. The defendant argues that if the portrait photograph was considered prejudicial at the first stage, it should have been inadmissible at the second stage as well.

It is clear that photographic evidence having a natural tendency to establish the facts in controversy is admissible. (*People v. Foster* (1979), 76 Ill. 2d 365; *People v. Speck* (1968), 41 Ill. 2d 177; *People v. Jenko* (1951), 410 Ill. 478.) In *People v. King* (1963), 29 Ill. 2d 150, 154, we said:

> "All evidence concerning 'the physical facts and circumstances showing a killing are admissible in evidence as tending to throw light on the transaction and to reveal the nature' of the crime. [Citation.] Also all facts of the crime which show the aggravated nature of the offense are relevant to the punishment to be set by the jury."

The life or portrait photograph was admissible at the second stage to evidence the beating inflicted by the defendant. The medical examiner had testified that there were numerous marks and bruises on the victim's body, including her face. The defendant testified that when he picked up the victim she looked as she did in the portrait photograph. The photographs considered together showed the condition of the victim before and after the defendant's

criminal conduct. The photographs are particularly relevant in light of the defendant's professed inability to remember whether he struck the victim.

"[Q]uestions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." *People v. Jenko* (1951), 410 Ill. 478, 482; *People v. Foster* (1979), 76 Ill. 2d 365, 376; *People v. Nicholls* (1969), 42 Ill. 2d 91.

Following his arrest, the defendant signed a 30-page written statement in which he confessed to the crimes charged and generally admitted the facts set out above. The trial court, after a pretrial hearing, found that the statement was voluntarily made. During the first phase of the sentencing hearing, each juror was given a copy of the statement over the defendant's objection, so the jurors could read along as the statement was read into the record by one of the prosecuting attorneys. The defendant admits that either method of communicating is proper, but contends that the use of both methods resulted in overemphasis of the defendant's statement, which violated the defendant's right to due process. The overemphasis was aggravated, the defendant says, by the fact that the statement went to the jury room during deliberations.

Although the defendant acknowledges in his brief that it is within the trial court's sound discretion to determine what documentary evidence shall be sent to the jury room (*People v. Caldwell* (1968), 39 Ill. 2d 346), he cites *People v. Spranger* (1924), 314 Ill. 602, for the proposition that it is improper to allow a defendant's written statement to go with the jury during deliberations. In *Caldwell*, which overruled *Spranger* to the extent it was contrary, this court said:

"*Spranger*, however, did *not* hold that it was reversible

error to permit the defendant's confession to go to the jury room. ***

We think it significant that every criminal conviction in Illinois since 1924 wherein the taking of a written confession to the jury conference room was claimed as reversible error has been factually distinguished from *Spranger* on appeal and affirmed." (39 Ill. 2d 346, 356-57.)

Whether evidentiary items should be taken to the jury room rested with the discretion of the trial court, whose decision will not be disturbed absent the showing of an abuse of discretion to the prejudice of the defendant. (*People v. Greer* (1980), 79 Ill. 2d 103; *People v. Magby* (1967), 37 Ill. 2d 197.) There was no abuse of discretion here.

In *People v. Willy* (1921), 301 Ill. 307, which is cited by the defendant, it was said: "To permit counsel to read to the jury from the transcript written up by the shorthand reporter or from the attorney's own memorandum would tend to over-emphasize the testimony of the witness which is thus re-read." (301 Ill. 307, 328.) The excerpt is not in point. Unlike in *Willy*, there was no testimony here by the defendant and no re-reading of it to the jury. The jurors were provided copies of the statement so they could follow it as it was being read to them. The statement was quite lengthy. The events described covered a period of three days and involved several locations. The copies were collected from the jurors after the statement had been read into the record. As we stated above in our discussion of the photographs admitted into evidence, the manner and extent of the presentation of evidence are largely within the discretion of the trial court. *People v. Foster* (1979), 76 Ill. 2d 365; *People v. Jenko* (1951), 410 Ill. 478.

In any event, certainly it was not reversible error to give a copy of the statement to each juror. The defendant's guilt was not at issue and most, if not all, of the facts in the statement were independently verified. The jurors were later properly allowed to take the statement to the

jury room, where they had the opportunity to read it. There was no substantial prejudice simply because the jurors had an earlier opportunity to read the confession.

The defendant also contends that he was deprived of his sixth amendment right to assistance of counsel by the introduction of testimony from a former law clerk who had appeared for him at a hearing on charges of earlier criminal conduct.

The defendant, with the victim bound and locked in the trunk of his car, appeared in court in Maywood on March 31, 1978, on pending charges for the aggravated kidnaping, rape, and armed robbery of Aline Krone. Kevin Breslin was a law student when under our Rule 711 (73 Ill. 2d R. 711) he appeared in court on behalf of the defendant. Breslin, who had never met the defendant before, conversed with Williams before approaching the bench, at which time the State requested and received a continuance.

At the trial for the crimes against Linda Goldstone, the defendant moved to bar Breslin's testimony on the ground that his testimony was a violation of the attorney-client privilege. The character of the privilege is illustrated in Disciplinary Rule 4—101 (87 Ill. 2d R. 4—101). It provides, in part:

"(a) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing to or would likely be detrimental to the client.

(b) Except when permitted under Rules 4—101(c) and (d), a lawyer shall not knowingly, during or after termination of the professional relationship to his client:

(1) reveal a confidence or secret of his client;

(2) use a confidence or secret of his client to the disadvantage of the client; or

(3) use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure."

The motion was denied and Breslin testified as to Williams' demeanor during their March 31, 1978, meeting. It was Breslin's testimony that Williams appeared articulate, well-dressed, calm and quite normal. Breslin did not relate the content of his conversation with the defendant, except to state that the defendant responded when Breslin called his name and told Breslin the nature of his father's business.

Although the attorney-client privilege does not usually extend to communications with a law student (8 Wigmore, Evidence sec. 2300 (McNaughton rev. ed. 1961)), Breslin was a person authorized under our Rule 711 to appear in court for limited purposes. As such, we will consider for purposes of this argument that he was acting as Williams' legal representative in the place of a licensed attorney and assume that the privilege extended to secrets or confidential communications between Breslin and the defendant.

The essential elements for the creation and application of the attorney-client privilege have been defined as follows:

> " '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.' 8 Wigmore, Evidence, sec. 2292 (McNaughton Rev. 1961)." (*People v. Adam* (1972), 51 Ill. 2d 46, 48.)

The purpose of the privilege is to promote the free flow of communication between attorneys and their clients by removing the fear of a compelled disclosure of confidential information. (*Taylor v. Taylor* (1977), 45 Ill. App. 3d 352; 8 Wigmore, Evidence sec. 2291 (McNaughton rev. ed. 1961).) The privilege "is based upon the confidential nature of such communications." *People v. Speck* (1968), 41 Ill. 2d 177, 200.

We consider that the defendant was not prejudiced by

Breslin's testimony. The defendant's appearance and demeanor were not confidential communications. They were subject to be observed by anyone present in the courtroom. In fact, Joseph Kazmierski, one of the prosecutors in the Krone rape trial, also testified at Williams' murder trial concerning his demeanor at the March 31, 1978, hearing. A defendant's voluntary disclosure of information, or other matters subject to being testified to, in the presence of opposing counsel or any other third person who is not the agent of the defendant or his attorney is not privileged. (*People v. Werhollick* (1970), 45 Ill. 2d 459; *People v. Ryan* (1964), 30 Ill. 2d 456.) The defendant argues that although other people may have observed him at the same time as Breslin, only Breslin could really testify to his demeanor. Breslin's personal impression of Williams' appearance, however, cannot be said to relate to "legal advice from a professional legal adviser in his capacity as such." (See 8 Wigmore, Evidence sec. 2292 (McNaughton rev. ed. 1961).) In merely observing the defendant as a person in the courtroom, Breslin was not acting in a representative capacity.

Nor was the defendant prejudiced by Breslin's disclosure that Williams had related the nature of his father's business and that Williams had responded to his name. As a general rule the attorney-client privilege does not extend to the identity of an attorney's client unless he would be prejudiced in some substantial way. (*People v. Doe* (1977), 55 Ill. App. 3d 811.) Since Williams pleaded guilty, his identity was not in issue and he was not prejudiced by Breslin's remark that he had responded to the calling of his name. Breslin did not disclose the nature of the elder Williams' calling, but only that he had been informed of it by the defendant. This information could not prejudice Williams.

After the defendant pleaded guilty, he orally and in writing requested a presentence investigation. During the

second phase of the sentencing hearing, that is, the phase to determine whether the death sentence should be imposed, Edward Swies, a probation officer who had conducted the presentence investigation, was called as a witness by the State. The defendant objected to his taking the stand. It was his contention that any conversation between him and the witness was privileged and that the witness' testimony would violate his fifth amendment right to remain silent. These objections were overruled.

During direct examination, there was this colloquy:

"People: And let me call your attention in this particular case to October 10th of this year. Do you recall on that day beginning your presentence investigation in regard to the defendant, Hernando Williams?

A. Yes, I do.

Q. Did you meet with Hernando Williams on October the 10th?

A. Yes, I did.

Q. And that was the day after he entered his plea of guilty?

A. Yes.

* * *

Q. Did you inquire of Hernando Williams when you met with him in regard to any military record that he may have had?

A. Yes, I did.

Q. Did you learn from him anything about that military record?

A. Yes.

Q. What did you learn from him?

A. He stated to me that he enlisted into the United States National Guard and that he had received an honorable discharge.

* * *

Q. During the course of this interview which you had on the 10th of October, was there any opportunity given by you or was there an opportunity given by you to the defendant to him to say anything that he wished to say to you?

A. Yes.

Q. In regards to this investigation?

A. Yes, there is.

Q. Did you at that time ask the defendant if he wished to make any comment with regard to the case involving Linda Goldstone?

(Objection overruled)

Q. Let me specify. That was with regard to the case in which he had just already pled guilty, correct?

A. Yes.

Q. Did you ask him how he felt about what had happened in this case.

A. Yes, I did.

Q. How his wife felt?

A. Yes.

Q. Did he respond?

A. Yes, he did.

Q. What did he say?

A. He stated to me that himself and his wife had an understanding of what has happened and that life must go on and that he—that she should care for their child.

Q. As part of this investigation, did you—that you conducted on the 10th of October, during the interview was there an opportunity afforded by you to the defendant to discuss with you any mental or emotional conditions and his general health?

A. Yes.

Q. What if anything did the defendant tell you about his mental condition or emotional conditions at the time?

A. He stated to me that he has never had any previous mental or emotional conditions.

Q. What about his general physical health?

A. He was in good health.

Q. When you asked him about the charge for which he had pled guilty of Linda Goldstone, he didn't speak to you about that, did he?

A. He stated to me, 'No comment.' ''

Swies testified that the defendant did not express any remorse or feelings of regret. On cross-examination he acknowledged that he did not have any educational background either in psychiatry or psychology. On redirect

examination the witness expressed his opinion that the defendant did not seem remorseful.

We consider that communications between a defendant and a probation officer are not privileged. The situation does not present the same concerns that support the attorney-client or physician-client privilege, *viz*, that the defendant will not be candid and will not make disclosures to the professional out of fear that the information will later be used against him. As the defendant's brief admits, "a defendant awaiting sentencing has no obligation to speak to a probation officer or to aid in the preparation of a presentence report." (*People ex rel. Kunce v. Hogan* (1976), 37 Ill. App. 3d 673.) For the same reason, the defendant's fifth amendment right to remain silent was not violated. The defendant not only voluntarily chose to talk to the probation officer, but also requested the investigation. Section 9—1(e) of the Criminal Code of 1961 provided constructive notice to the defendant that the presentence report might be used against him at a death penalty hearing. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).

The defendant further contends that Swies' "no comment" response was an improper comment on his silence under *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. The defendant suggests that the reference to the defendant's silence was meant to impress upon the jury the notion that the defendant was not remorseful or cooperative. In *Doyle*, it was held that the prosecutor's reference during closing argument to the defendant's silence was improperly used to impeach his testimony at trial. Williams, instead of choosing to remain silent, requested an investigation and discussed his military service history, his physical and mental health, and his understanding with his wife concerning the situation that resulted from his criminal acts. Too, the reference to the defendant's failure to comment was made by a witness, not by a prosecutor during closing argument. The People never referred to the

witness' "no comment" response.

Since Swies also stated that the defendant had cooperated throughout the interview and the defendant later took the stand and made a rather complete disclosure of his conduct, it cannot be seriously contended that Swies' "no comment" response influenced the jury to believe that the defendant was uncooperative.

The People did express surprise during closing argument that Williams had not expressed remorse, but its surprise was based on the defendant's testimony during trial, not on Swies' "no comment" reference. The defendant concedes that it is proper during a sentencing hearing to consider the defendant's "lack of a penitent spirit." (*People v. Morgan* (1974), 59 Ill. 2d 276.) If any error occurred by Swies' opinion testimony concerning remorse, it was cured by his testimony on cross-examination when he stated that he was not qualified to express an expert opinion.

During cross-examination, at the request of the defendant's attorney, Swies read aloud a portion of a "victim impact statement" which was prepared during the presentence investigation. The part he read was written by the defendant's counsel and stated that the defendant recognized his responsibility for his conduct, was cooperative, and thought he could help others if he were allowed to live by showing through example the consequences of his conduct. On redirect examination, at the State's request, he read, over the defendant's objection, a section of the "victim impact statement" which had been written by one of the prosecuting attorneys. The part read narrated that the victim "was a 29-year old mother of a 3-year-old son, the wife of a doctor," and that she was on her way to teach a course in the Lamaze method of childbirth when she was abducted. It also referred to the sorrowful impact of the crime on the victim's immediate family and parents.

We do not consider it was reversible error under the circumstances to have the prosecution's statement read.

The defendant was the party which introduced the fact that the attorneys had submitted comments during the presentence investigation, and the defense was the first to have its comment read to the jury. The defense was aware that the prosecution had made a comment and presumably knew that it would attempt to introduce its comment on redirect examination. If there was impropriety in having the lawyers' comments read, it must be kept in mind that the defense opened the door and should not complain that the prosecution also crossed the threshold.

The defendant was not substantially prejudiced. The factual statements had substantially been established prior to Swies' testimony, and the jury was informed that the comment was made by one of the prosecutors.

During the hearing in aggravation and mitigation, the defendant attempted to have a newspaper reporter, three clergymen, and a professor of psychiatry describe what a "typical" execution entailed and give opinion testimony as to the deterrent effect of capital punishment. Only the professor had met the defendant. The State's motion *in limine* to prohibit their testimony was allowed. Without their testimony, the defendant contends, the jury was not able to determine if the death penalty was proportionate to the seriousness of the offense or to consider the defendant's potential for rehabilitation. The court did allow a fourth clergyman, Rev. Thomas Feamster, to take the stand, but objections were sustained on the ground of relevancy as to the questions posed.

In this State a sentence must correspond to the seriousness of the offense and have the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, sec. 11; Ill. Rev. Stat. 1979, ch. 38, par. 1—2(c).) The testimony of the proposed witnesses would have gone to beliefs in the unwisdom and immorality of the death penalty, the repelling nature of an execution in an electric chair and that the penalty is not a deterrent to crime. Such testimony would

not have been proper. In 1970, the voters of this State in a referendum approved the death penalty. The Supreme Court of the United States and this court have held capital punishment not to be unconstitutional. (*Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 536.) Within constitutional limits, the manner of execution is a matter for the legislature. The defendant was given the opportunity to present evidence in mitigation of his offenses, not to offer views on the death penalty statute. Arguments against the death penalty in general and not containing evidence in mitigation are inadmissible. See *Lockett v. Ohio* (1978), 438 U.S. 586, 604 n.12, 57 L. Ed. 2d 973, 990 n.12, 98 S. Ct. 2954, 2965 n.12 (Burger, C.J., joined by Stewart, Powell and Stevens, JJ.); *People v. Waldron* (1965), 33 Ill. 2d 261, 263.

The professor of psychiatry met with the defendant for a total of 16 hours. The record shows that he would have testified that he wished to study the defendant further for insight into the motivations behind criminal conduct. The professor did not state why Williams would prove a better candidate for study than any other criminal. Too, the fact that the defendant's conduct may be of some scientific interest is not a factor in mitigation of his criminal acts, since it does not concern the circumstances of the offense or the character and record of the defendant. (See *People v. Jones* (1982), 94 Ill. 2d 275; *People v. Gaines* (1981), 88 Ill. 2d 342, 382.) Nor would it serve to restore the defendant to useful citizenship. (See Ill. Rev. Stat. 1979, ch. 38, par. 1001—1—2.) It was not an abuse of discretion for the trial court to exclude the professor's testimony.

The defendant's request that the jury be transported to the State penitentiary at Joliet to view the electric chair was also denied. For the same reasons that the proffered witnesses' testimony was rejected, we do not consider the court's denial of the defendant's request to transport the

jury an abuse of discretion.

The defendant next complains that the State should not have been allowed to both open and close the final arguments at the sentencing hearing. Prior to closing argument, the defendant moved to establish the order of the final arguments. It was the defendant's contention that since the State did not have to overcome a burden of proof at this stage of the trial, there should be no rebuttal argument. The defendant proposed that the State would first present its argument in aggravation, which would be followed by the defendant's argument in mitigation. The trial court, however, allowed the State to present argument in rebuttal.

Although the State acknowledges that there is no burden of proof at the aggravation and mitigation hearing, it argues that it was entitled to rebuttal time because it was the complaining party and had gone forward with the evidence. Supreme Court Rule 233 provides:

> "The parties shall proceed at all stages of the trial *** opening and closing statements, the offering of evidence, and the examination of witnesses, in the order in which they appear in the pleadings unless otherwise agreed by all parties or ordered by the court. ***." (73 Ill. 2d R. 233.)

As the initiator of this action, the State would begin the closing arguments unless otherwise agreed or ordered by the court. Too, we note that the trial court, as authorized by Rule 233, exercised its discretion in allowing the State to open and close the final arguments. Under our Rule 412(c) the State has the affirmative duty to disclose to the defendant's counsel any mitigating evidence of which it has knowledge. The State's contention that it has the burden of going forward with the evidence, therefore, would appear to be correct.

The defendant's citation of *Liptak v. Security Benefit Association* (1932), 350 Ill. 614, is not persuasive. In *Liptak*, this court held that a defendant asserting an affirma-

tive special plea and admitting the establishment of the plaintiff's case is entitled to open and close in presenting the evidence and arguments since it has the burden of proof. In contrast here, neither party had to overcome the burden of proof and the plaintiff's case was not admitted by the defendant. Too, this court did not deny the right to a rebuttal argument in *Liptak*. Rather, the court allowed the party entitled to open the arguments to offer rebuttal as well.

The defendant further argues that he was denied what he calls his right of allocution before the jury. The record does not disclose, however, any indication that the defendant requested to address the jury by way of an unsworn statement. Too, Williams did not raise this issue in his post-trial motion to vacate the sentence. Thus, the issue was waived. (*People v. Lucas* (1981), 88 Ill. 2d 245.) We will, however, consider the argument.

Section 5—4—1(a)(5) of the Unified Code of Corrections provides:

> "Except when the death penalty is sought under hearing procedures otherwise specified, after a determination of guilt, a hearing shall be held to impose the sentence. At the hearing the court shall:
>
> * * *
>
> (5) afford the defendant the opportunity to make a statement in his own behalf." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(a)(5).)

The statute, thus, explicitly excludes death penalty hearings from its effect.

Our decision in *People v. Gaines* (1982), 88 Ill. 2d 342, is dispositive. We said in *Gaines*:

> "What section 5—4—1(a)(5) provides is the right of allocution in its traditional context: the opportunity to make a statement to the court in the course of a sentencing procedure in which the jury plays no role. That opportunity, even though it is not required by the statute, was offered him. What the defendant sought was the opportunity to make an unsworn statement to the sentencing

jury for consideration along with testimony given under oath and the arguments of counsel. The legislature may well have considered that such a statement would at the least confuse the jurors, and might also impair their ability to weigh the aggravating and mitigating factors disclosed by the testimony as the statute directs them to do." 88 Ill. 2d 342, 380.

Although the defendant here did not under our law have the right of allocution, he was given the opportunity to address the court before sentence was imposed and he declined. Too, he did testify at length before the jury.

The defendant complains that he was denied a fair hearing because of improper comment by the prosecutor. The defendant moved at one stage for a rule to show cause why one of the prosecutors should not be held in contempt, citing alleged instances of impropriety. The court, after noting that there had been improper conduct by counsel on both sides, denied the motion. The trial court was certainly in a superior position to assess the conduct of counsel, and it cannot be said that it abused discretion in denying the motion for a rule to show cause.

In some of the instances complained of no objections were made or objections were sustained and the jury was instructed to disregard what was said. The defendant says that the "most blatant" instances of misconduct occurred during cross-examination and argument.

He complains that during cross-examination of the defendant's father, Rev. David Williams, a prosecutor commented to the witness that the prosecution had "nothing against him." An objection to the statement was sustained. The prosecutor rephrased the statement, and again an objection was sustained. It was improper for the prosecutor to repeat the statement to Rev. Williams after the objection had been sustained. The trial court did sustain objection to the rephrased comment, however, and when the jury was instructed to disregard it, we consider that any impropriety was cured. Later, the father was asked

whether he would attempt to obtain parole for his son if he received life imprisonment. An objection was sustained, and the jury was told to disregard the question. Subsequently, the defendant's mother, Inell Quinn, was asked a similar question on cross-examination. Again an objection was sustained.

The prosecutor's question regarding the possibility of parole has to be considered in the context of all of the testimony arguing against the imposition of the death penalty. The State notes that relatives and friends asked that the death sentence not be imposed, and that their testimony was on the explicit assumption that the defendant would then spend his life in prison. The State argues that the defendant thus invited questions regarding parole possibilities in that the defense was attempting to form an impression on the jury that the only possibilities of sentences were death or natural life without parole. The State points out too that during closing argument one of the defense attorneys told the jury: "Your choice is not death or freedom. Your choice is death or certain life imprisonment without parole." The State concludes that its questioning regarding parole possibilities was not erroneous in light of the defense inquiries and that it was proper for the State to note that there were alternative punishments.

Clarence Johnson, a friend of the defendant, gave negative responses when asked on cross-examination whether he believed that the defendant was capable of escaping from prison or harming a prison guard. No objection was made, but the defendant moved later for a mistrial, which was denied. During closing argument, one of the prosecutors asked the jury whether the defendant could "ever be a fit person to be around the other people in jail and to be around those jail guards?" The defendant's objection to this question was sustained and, at the defendant's request, the jury was instructed to disregard the remark. We consider that the court's ruling on the objections and its in-

struction to disregard corrected any error in the argument. (See *People v. Jones* (1982), 94 Ill. 2d 275, 298—99.) This question by the prosecutor in argument and the question to Johnson on cross-examination have to be considered, the State observes, in the context of the defense contention that the defendant, if the death penalty were not imposed, would be of benefit to society through his wholesome influence and his counseling of other inmates. (See *People v. Hairston* (1970), 46 Ill. 2d 348, 375.) The witness Johnson testified that the defendant has brought him to religion and said that if the defendant were given life imprisonment "he could be a model for somebody else. After some therapy, he can change them, because he changed my life around."

We cannot say that the defendant was deprived of a fair trial on these grounds.

After the jury announced its verdict which called for a sentence of death, the jury was polled by the court clerk at the request of the defendant's counsel. The clerk addressed the jury:

"THE CLERK: Ladies and gentlemen of the jury, I will ask you the following question:

'Was this and is this now your verdict?'

If it was your verdict you will answer:

'It was and is now my verdict.'

If not, you will answer:

'It was not and is not my verdict.'

No. 285, Stanley Margalski.

JUROR MARGALSKI: Yes, it was and is my verdict.

THE CLERK: No. 282, Robert Lynch.

JUROR LYNCH: It was and is my verdict."

Each of the 10 other jurors responded exactly as Lynch had. No objection was made to the jury poll at the time it was taken. The defendant now complains, as he did in his post-trial motion to vacate, of the manner in which the jury was polled. The defendant asserts that the purpose of polling the jury is to allow the jurors the opportunity to

change their verdict, and that this purpose was defeated by the form of the question addressed to each juror. The question propounded to the jurors and the responses recommended by the trial judge, the defendant says, prevented the jurors from changing the verdict that had been reached during their deliberations in the jury room.

The contention of the defendant is somewhat ambiguous. "The polling of a jury is intended 'to ascertain whether any juror had been coerced into agreeing upon a verdict—coerced by his associate jurors.' [Citation.] While polling the jury, a trial court must be careful not to hinder a juror's expression of dissent." (*People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, 211.) The trial court, on polling, must determine that the jury verdict accurately reflects each juror's vote as reached during deliberations and that the jurors' votes were not the result of force or coercion. Once that has been determined, the purpose of the polling process has been served.

A jury is to reach its verdict during secret deliberations in the jury room. The deliberations are to determine whether a unanimous verdict can be reached. Except during the polling process, a juror should not be allowed to change his or her individual vote outside the jury room after a unanimous verdict has been reached and announced in open court. The polling process cannot be made another arena for deliberation. *People v. Kellogg* (1979), 77 Ill. 2d 524, 529.

The form of the question used here in polling the jury was directly approved in *People v. Kellogg* (1979), 77 Ill. 2d 524, and implicitly approved in *People v. Preston* (1979), 76 Ill. 2d 274. In *Preston*, after a juror responded "Compromise" to the question during polling, the trial court questioned the juror further as to whether the verdict of guilty accurately reflected her decision during deliberation. She answered affirmatively. This court stated, "There is no basis whatever in the record for the defendant's claim that

[the juror] was prevented from giving a negative answer." 76 Ill. 2d 274, 286.

The jurors here had the opportunity to disclose any coercion, mistake, or dissention from the verdict announced. *Preston* demonstrates that the jurors were not "locked in" or limited to giving only a yes-or-no answer. The record shows that the affirmative responses given here by the jurors were clear and unqualified. There was no cause for the trial court to conduct further questioning. See *People v. Kellogg* (1979), 77 Ill. 2d 524, 527-28.

Moreover, any objection to the polling of jurors should be made at the time of the polling, not after the jury has separated following its discharge. Here the defendant's objection was made for the first time three months after sentencing in a post-trial motion to vacate his sentence. Although we have chosen to consider the question, any claim of error was waived by the failure of the defendant to make timely objection. *People v. Kellogg* (1979), 77 Ill. 2d 524, 530-31; see *Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532.

Finally, the defendant complains that the sentences imposed were inconsistent. He contends that we must either vacate the sentences and remand for resentencing or order that all of the sentences be served concurrently with the sentences he is now serving for previous crimes.

At the time of sentencing, the defendant was under sentence of three concurrent 30-year terms for the rape, aggravated kidnaping and armed robbery of Aline Krone. At the conclusion of the sentencing hearing on the crimes against Linda Goldstone, the following colloquy was had:

"THE COURT: You have previously been found guilty of the same offense, to-wit, rape, which the record will certainly reflect. The record also reflects that in committing the offense of rape it was accompanied by exceptionally brutal heinous behavior, indicative of wanton cruelty. The court will, therefore, on the charge of rape, sentence you to an extended term of 60 years in the Department

of Corrections. On the charge of armed robbery, the court will sentence you to a term of 30 years in the Department of Corrections. On the charge of aggravated kidnapping, the court would likewise sentence you to a term of 30 years.

MR. SHABAT: Your Honor, we would ask that those run concurrent with each other.

THE COURT: That will be the order. The sentences will be served concurrently with each other.

MR. SHABAT: And that those be served consecutively with 775—0211 [*sic*] [the Krone case].

THE COURT: The court may enter sentences to run consecutively if one of the offenses for which the defendant was convicted was a Class X felony, where severe bodily injury was inflicted.

The record clearly reflects the fact that severe bodily injury was in fact inflicted.

On the charge of rape, the court would order on the charge of rape, that sentence be served consecutively with the sentence previously imposed by Judge Bentivenga, in Case 77—I-5—02—11 [the Krone case].

Judgment will be entered on the findings.

I would also suggest—

MR. SHABAT: Your Honor, excuse me. Are you also sentencing consecutively with regard to the armed robbery and aggravated kidnapping in this case?

THE COURT: No, sir. Just as to the charge of rape, consecutively."

No comment was made at the time by defense counsel.

The defendant argues that the sentences must be vacated or modified since it is impossible for the three sentences imposed here to run concurrently with each other, as the judge indicated, while only one of the three sentences, the sentence for rape, is to run consecutively to the rape sentence imposed in the Krone case.

There appears to be the inconsistency the defendant describes, but the court's sentencing orders are clear and leave no room for conjecture. The relevant portions of the sentencing orders read:

"ORDERED that the defendant Hernando Williams is hereby sentenced to the Illinois Department of Corrections as follows:

1/14/80 The Honorable Judge James E. Strunck sentenced the Defendant to a Term 30 yrs - Ill Dept - Corr —Ct 4 of indict [Aggravated Kidnaping] - Judgment Ent - Plea & finding - Court o/c Said Sentence Conc. - Arm Robbery (Ct 6) of Indt - 30 years. BOTH COUNTS CONCURRENT"

and

"ORDERED that the defendant Hernando Williams is hereby sentenced to the Illinois Department of Corrections as follows:

1/14/80 - The Honorable Judge James E. Strunck Sentenced the Defendant to a Term of 60 yrs - Ill Dept-Corr - Charge of Rape - Count 5 of indict - Judgment ent - Plea & Finding of Court. o/c Said Sentence *Consecutively* with Sentence imposed 8-3-78 (as to 7715-0211) By Judge Bentivenga." (Emphasis in original.)

A judgment in a criminal proceeding must be clear and definite so that its meaning may be found from the language used without resort to judicial construction to ascertain its meaning. (*People v. Walton* (1969), 118 Ill. App. 2d 324.) In a criminal proceeding, the pronouncement of the sentence is the judicial act which comprises the judgment of the court. The entry of the sentencing order is a ministerial act and is merely evidence of the sentence. (*People v. Allen* (1978), 71 Ill. 2d 378, 381.) In determining the sentences that have been imposed, a reviewing court may refer to the sentencing order. (*People v. Toomer* (1958), 14 Ill. 2d 385; *People v. Puschman* (1951), 409 Ill. 264.) Here the sentencing orders make it clear what sentences were imposed.

For the reasons given, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order fixing Tuesday, November 15, 1983, as the date on which the sentence of death entered

in the circuit court is to be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

JUSTICE SIMON took no part in the consideration or decision of this case.