THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES L. TREECE, Defendant-Appellant.

Third District No. 3—85—0457

Opinion filed August 4, 1987.

398

400

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

Tony L. Brasel, State's Attorney, of Watseka (Rita Kennedy Mertel, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, James L. Treece, and his codefendant, William L. Braid, were charged in an indictment in Iroquois County, Illinois, with eight counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(3)), one count of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)), two counts of aggravated criminal sexual assault (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—14(a)(1), (2)), two counts of aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(a)(3), (a)(5)), one count of home invasion (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a)), and two counts of conspiracy (Ill. Rev. Stat. 1983, ch. 38, par. 8—2). A severance of the two defendants' cases was granted, and, in addition, defendant's place of trial was transferred to Will County. Following a jury trial, defendant was found guilty of murder, aggravated criminal sexual assault, aggravated kidnapping, armed robbery, and conspiracy. He was sentenced to a term of natural life imprisonment for murder, concurrent extended terms of imprisonment of 60

years each for armed robbery, aggravated criminal sexual assault, and home invasion, and a concurrent extended term of imprisonment of 30 years for aggravated kidnapping. The conspiracy conviction was vacated. The case was transferred to this court from the Appellate Court for the Third District for purposes of appeal.

Defendant raises the following issues on appeal: (1) whether the prosecutor's use of peremptory challenges to remove black members of the venire violated his constitutional rights to a jury drawn from a fair cross-section of the community and to equal protection; (2) whether the prosecutor's use of peremptory challenges to remove young persons under age 30 from the jury violated his constitutional rights; (3) whether the Illinois aggravated criminal sexual assault statute is unconstitutional; (4) whether the trial court erred by allowing the State's motion pursuant to Supreme Court Rule 413(a)(vii) (107 Ill. 2d R. 413(a)(vii)) for the taking of hair, blood, and saliva samples from defendant without complying with constitutional requirements; (5) whether the trial court erred in striking certain defense testimony as a sanction for an alleged discovery violation; (6) whether the trial court abused its discretion by allowing gruesome photographs to go to the jury; (7) whether the trial court erred in imposing extended-term sentences for the convictions of offenses other than murder; and (8) whether the sentence of natural life imprisonment was grossly disparate with his codefendant's sentence of 50 years' imprisonment and should be reduced.

As the principal issues raised on appeal involve juror selection, pretrial discovery, the constitutionality of a statute, and sentencing, we need not detail entirely the lengthy trial evidence. The charges against defendant, a male Caucasian who was 18 years old at the time of the offense, all arise out of the abduction and shooting death of 15-year-old Jessica Hosick on December 26, 1984. The main testimonial evidence against defendant was given by his codefendant, William L. Braid, who testified under a promise from the State that if he testified truthfully and later was found guilty of murder, the State would recommend that he receive no more than 80 years' imprisonment.

Braid, who was age 25, testified that he was with defendant on December 26, 1984, at the apartment defendant shared with his father in Watseka, Illinois. Defendant told him he was going to go over to the apartment next door and ask the girl to come over, have a few drinks, and have sex with her. He stated that defendant later got out a .38 Smith and Wesson handgun, put it inside his coat, and went to the apartment next door. Braid testified that defendant said he was going to ask the girl next door if he could use the telephone, but came

back and said she didn't have a telephone. Defendant then said he was going to go over there and ask if he could use a cup of sugar and then returned following behind the victim, Jessica Hosick, with the gun pointing at her.

Braid testified that they took the victim into the bedroom of the apartment and that defendant told her to take her clothes off. She was then tied to the bed. Defendant left the room, and Braid attempted to have sex with her, but was unable because he didn't have an erection. Braid then ejaculated into her mouth. Defendant entered the bedroom, and Braid left.

Later, Braid reentered the bedroom. Defendant was getting dressed, and Braid cut the socks tying the victim to the bed with defendant's locked-blade knife. Defendant then told the victim to get dressed, that they were going for a ride. They left in the truck with Braid driving, the victim in the middle, and defendant on the passenger side. As they left Watseka, defendant asked the victim if she had any money in her wallet. Defendant then ordered her to take the money out and hand it to Braid, which she did.

Braid testified that defendant told him to turn off Route 24 at a sign that said "camping," that he drove down the road 10 to 15 minutes, and that he stopped in a wooded area. Defendant was still pointing the gun at the victim, and they all got out of the truck. Defendant then ordered the victim to remove her pants and underwear. The victim complied and then put her shoes back on. Braid testified that he then had anal intercourse with the victim and that defendant then ordered her to take off the rest of her clothes and to walk toward a tree. Defendant tossed the clothes in a ditch.

Braid stated that the victim stood, wearing only socks and shoes, with her back against the tree. While he held a lantern from his truck shining toward the tree, defendant shot her in the left shoulder. Braid testified that the victim then fell to a kneeling position and that defendant then fired several more shots from approximately 15 feet away. Braid and defendant then left in the truck and had pizza at Monical's Pizza in Watseka. The victim's body was not found until December 31, 1984.

Dr. James Blanding testified that he performed an autopsy on the body the same day the body was found. He identified photographs of the victim showing the entrance and exit wounds of the four bullets which hit the victim in the right side of her upper lip, her right cheek, the left side of her neck and her left shoulder. Blanding testified that none of the wounds would have proved immediately fatal, but that the victim would have bled to death over a period of 30 minutes due to

the damage done by the bullets. He also identified a photograph showing an obvious tear in the inside lining of the victim's vagina which he stated was of a type commonly seen in forceful-type sexual intercourse and a photograph showing multiple superficial tears indicating forceful entry into the victim's rectum during intercourse.

Ronald Eugene Wall, a sergeant in the Iroquois County sheriff's department, testified that two guns were recovered from defendant's father at his apartment on December 31, 1984, one of them a .38 caliber Smith and Wesson chrome revolver. He also identified a locked-blade knife found in defendant's suitcase and a lantern recovered from Braid's pickup truck.

James Roberts, a forensic scientist, testified that he had determined that three bullets, one found under the victim, one imbedded in the tree with hair around it, and one removed from the victim's back, were fired from the .38 caliber Smith and Wesson revolver recovered from defendant's apartment.

Diane Schneider, also a forensic scientist, testified that semen samples were taken from the victim and also from a brown blanket found in defendant's apartment. However, no males could be excluded as sources of the semen present. She also did hair comparisons using samples obtained from the victim, defendant and Braid. Briefly summarized, she testified that a head hair consistent with that of the victim was found on a tan sheet and another on a pillowcase removed from defendant's apartment; that two pubic hairs consistent with those of the victim were found on a blue blanket removed from defendant's apartment; and that head hair consistent with that of defendant was found on the victim's T-shirt and panties. She also testified that fibers consistent with the brown blanket removed from defendant's apartment were found in the victim's panties, socks, and shoes.

Other testimony at trial showed that defendant and Braid were seen at Monical's Pizza around 9:15 p.m. on December 26, 1984, and that defendant left for Texas by bus on December 29, 1984, although he had a reservation to fly there on January 12, 1985.

Joseph B. Mathy, sheriff of Iroquois County, was called to testify by the defense. He stated that it was 18 miles from defendant's apartment to the spot where Braid testified they turned around on their way to Kankakee and would take approximately 23 minutes each way. The sheriff testified that it was 14.4 to 14.5 miles from defendant's apartment to the murder scene and would take approximately 20 minutes to drive each way.

Defendant's father, Jerry Treece, testified that he was a truck

driver and left the morning of December 26, 1984, and did not return until December 28, 1984. He stated that defendant had been wanting to move to Texas for three or four months and had asked him again December 28, 1984, if he could leave early. Treece also testified as to time tests he and defense counsel conducted. He stated that it took 54 minutes to travel from the apartment to the murder scene and then back past the apartment to Monical's Pizza. During cross-examination Treece referred to handwritten notes made by defense counsel during the time tests. The State asked that the testimony be stricken because the defense had not disclosed the notes during discovery. The court granted the motion.

Defendant testified that he had known William L. Braid for about two weeks prior to Christmas 1984 and that he had shown Braid his father's .38 caliber gun about a week before Christmas. He stated that he was sick on December 26 and that Braid came to the apartment around 5 p.m. They watched television about an hour and then went to the store. After returning, Braid just dropped him off, and defendant stated he went inside, got sick again, and watched television. Braid came back in, but left while defendant was in the bathroom. Defendant stated he watched television until about 8:45 p.m., when he walked to the store to buy medicine. He saw Braid on his way home and went with him to Monical's Pizza. Defendant further testified that Braid told him on December 28, 1984, he had taken the gun that night while defendant was in the bathroom and had killed the girl.

Following the guilty verdicts, the trial court, after a sentencing hearing, found there was a mitigating factor, defendant's lack of a significant history of prior criminal activity, which was sufficient to preclude the imposition of a death sentence. The court imposed a natural-life sentence for the murder conviction after finding the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and finding one of the aggravating factors in subsection (b) of section 9—1 of the Criminal Code of 1961 was present. The guilty verdict on the conspiracy count was vacated, and extended-term sentences were imposed on the remaining verdicts.

Defendant's first contention on appeal is that there was no proper basis for granting the State's pretrial discovery motion to permit the taking of hair, blood, and saliva samples from defendant so that this evidence was inadmissible. Defendant argues that (1) the motion was not the constitutional equivalent of a search warrant, (2) assuming that such a motion might be used in place of a search warrant, the fourth amendment requirement of oath and affirmation and probable

cause were not met, and (3) the existence of an indictment does not present probable cause for a specific search not incident to arrest.

On January 14, 1985, three days after the indictment was returned against defendant, the State filed a motion pursuant to Supreme Court Rule 413(a) (107 Ill. 2d R. 413(a)) requesting an order permitting the taking of samples of pubic hair, chest hair, head hair, blood, and saliva from defendant. A hearing was held on the motion January 18, 1985, and defendant argued that the State had not met its obligation of establishing both some foundation for the request of this information and probable cause that these items were needed. The prosecutor responded that he had talked to a chemist from the State crime laboratory who informed him that certain hairs, swabs, and smears from the victim had been submitted to her. The prosecutor stated:

> "[S]he determined that there was some spermatozoa which she said is possible to make matches from the blood types of the certain secreters if she had the whole blood types of certain persons to match the spermatozoa against. She did say there were hairs recovered on or about the clothing or on the victim herself and that, morphologically, she could make a statement, if there were standards, whether those hairs matched person or persons, and she said the hairs were different type of body hairs. I believe, for those reasons, that the blood that we're requesting and the hairs that we're requesting and also saliva, which is a method of determining whether a person is indeed a secreter, would be necessary."

The trial court then granted the motion, stating that there was adequate probable cause shown by the representations of the prosecutor and by the fact that defendant had been indicted by the grand jury.

Disclosure to the prosecution in criminal cases is provided for in Supreme Court Rule 413, which states, in pertinent part, as follows:

> "Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the accused, among other things, to:
>
> * * *
>
> (vii) permit the taking of samples of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof." (107 Ill. 2d R. 413(a) (vii).)

This provision is not unique to Illinois, as it closely patterns the disclosure to the prosecution standard 3.1 relating to "Discovery and Procedure Before Trial" adopted by the American Bar Association

Project on Minimum Standards for Criminal Justice. See ABA Standards, Discovery and Procedure Before Trial sec. 3.1 (1970).

The constitutional protections which most directly limit compelled defense disclosure to the prosecution are the privilege against unreasonable searches and seizures and the privilege against self-incrimination. (Ill. Ann. Stat., ch. 110A, par. 413(a), Historical and Practice Notes, at 678 (Smith-Hurd 1985).) It has been held, however, that requiring an accused to submit to the taking of blood samples does not compel him to incriminate himself. *Schmerber v. California* (1966), 384 U.S. 757, 765, 16 L. Ed. 2d 908, 916-17, 86 S. Ct. 1826, 1832-33.

■ Defendant argues to the contrary, that compelling him to provide these samples violated his fourth amendment privilege against unreasonable searches and seizures. He contends first that a search warrant should be obtained rather than a court order, citing *United States v. Anderson* (7th Cir. 1984), 739 F.2d 1254. *Anderson*, however, does not support this proposition. Although the district court in *Anderson* denied the government's motion for a court order requiring the defendant to submit to the taking of hair samples and suggested a search warrant be obtained, the circuit court expressly declined to decide the issue of whether a search warrant was necessary. 739 F.2d 1254, 1256.

There is authority in Illinois that Rule 413(a)(vii) can be used to obtain a blood sample from a defendant without resort to a search warrant following indictment or information. In *People v. Jones* (1975), 30 Ill. App. 3d 562, 333 N.E.2d 725, the appellate court held that where probable cause was shown to the judge to justify the ordering of a blood sample, the order for production of the blood sample under Rule 413(a) is, in essence, the same as a search warrant, and defendant's right to be protected from an unreasonable search and seizure was well protected. (30 Ill. App. 3d 562, 564, 333 N.E.2d 725.) In *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27, our supreme court upheld the trial court's grant of a motion requiring the defendant to permit a blood sample to be taken finding that, although the blood sample was taken prior to the adoption of Rule 413, the procedure followed "provided adequate safeguards of defendant's rights." (56 Ill. 2d 201, 208, 306 N.E.2d 27.) Decisions in other jurisdictions as well hold that a search warrant is not required where, under a disclosure rule similar to Rule 413, a court was empowered to permit the taking of blood and other bodily materials. See *State v. Easthope* (Utah 1983), 668 P.2d 528; *In the Matter of ABE A.* (1982), 56 N.Y.2d 288, 437 N.E.2d 265, 452 N.Y.S.2d 6.

■ Of course, it must be recognized that although the extraction

of blood from an accused does not offend the fourth amendment to the United States Constitution (U.S. Const., amend. IV), search warrants are ordinarily required. (See *Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826.) "The requirement that a warrant be obtained is a requirement that the inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " (394 U.S. 757, 770, 16 L. Ed. 2d 908, 919-20, 86 S. Ct. 1826, 1835-36.) Where probable cause is shown to a judge to justify a court order pursuant to Rule 413(a)(vii) requiring an accused to submit to the withdrawal of blood and other body materials, we hold that this satisfies the warrant requirement. *People v. Jones* (1975), 30 Ill. App. 3d 562, 564, 333 N.E.2d 725; see *People v. Turner* (1973), 56 Ill. 2d 201, 208, 306 N.E.2d 27.

■ Defendant further contends, however, that even if Rule 413 can take the place of a search warrant in these circumstances, the State's motion was not supported by "oath or affirmation" as is required to obtain a search warrant. In *People v. Jones* (1975), 30 Ill. App. 3d 562, 333 N.E.2d 725, representations by the prosecutor in support of the motion and the fact that the judge issuing the order to give a blood sample had presided at the defendant's preliminary hearing were relied on by the appellate court in finding that probable cause was shown to the issuing judge. 30 Ill. App. 3d 562, 563-64, 333 N.E.2d 725.

Defendant here was given an adversarial hearing on the State's motion. He did not request an evidentiary hearing to contest the prosecutor's representation of facts supporting the issuance of the court order. Defendant only disputed, pertinent hereto, that the State had not shown why the blood samples and bodily materials were needed. Because defendant was given greater procedural protection than he has under a search warrant by his participation in an adversarial hearing (see *State v. Easthope* (Utah 1983), 668 P.2d 528, 532), we conclude that under the circumstances presented, the representations of the prosecutor need not have been on "oath or affirmation." Nor do we find that Rule 413 so requires.

■ Defendant's final argument is that the State failed to show probable cause for the issuance of the order. The fact that defendant was indicted by the grand jury for murder, kidnapping, and aggravated criminal sexual assault itself suggests the required relevance of a test of defendant's blood and bodily material. (See generally *Schmerber v. California* (1966), 384 U.S. 757, 770, 16 L. Ed. 2d 908, 919-20, 86 S. Ct. 1826, 1835-36.) The aggravated criminal sexual assault

counts alleged, in part, that defendant and his codefendant placed their penises in the vagina, anus, and mouth of the victim. The prosecutor here further represented that a chemist from the State crime laboratory had found hairs and spermatozoa in the victim's body cavities as well as other bodily hairs on the victim and her clothing. We conclude that these circumstances are sufficient to show probable cause that the desired evidence may be found rather than a mere chance of its discovery. See *Schmerber v. California* (1966), 384 U.S. 757, 768-70, 16 L. Ed. 2d 908, 918-20, 86 S. Ct. 1826, 1834-36.

■■ Defendant next contends that he was denied his constitutional right to a jury drawn from a fair cross-section of the community and to equal protection of the law because of the prosecutor's use of peremptory challenges to remove three black members of the venire. Defendant cites the recent Supreme Court case of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, which held that a prosecutor's use of peremptory challenges to exclude blacks from a jury trying a black defendant was a proper basis for an equal protection claim of purposeful discrimination. The State argues that *Batson* has no application here as it was decided April 30, 1986, and should not be applied retroactively. The Supreme Court has recently decided this issue adversely to the State's position and retroactively applied *Batson* to all cases pending on direct review, such as the case here. *Griffith v. Kentucky* (1987), 479 U.S. ___, ___, 93 L. Ed. 2d 649, 661-62, 107 S. Ct. 708, 715-16; see *People v. Seals* (1987), 153 Ill. App. 3d 417, 422, 505 N.E.2d 1107.

■■ The Supreme Court in *Batson*, however, stated that in order to establish a *prima facie* case of purposeful discrimination "the defendant first must show that he is a member of a cognizable racial group, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." (*Batson v. Kentucky* (1986), 476 U.S. 79, 96, 90 L. Ed. 2d 69, 87, 106 S. Ct. 1712, 1722-23.) Because defendant here is Caucasian, his reliance on *Batson* to allege the purposeful exclusion of blacks violated his constitutional rights is inapplicable.

■■ This conclusion that *Batson* has no application to this case also is dispositive of defendant's motion, filed June 26, 1987, requesting that the case be remanded to the circuit court for a hearing to be conducted in accordance with *Batson*. Defendant here cannot establish a *prima facie* case under *Batson*, and the motion is denied.

■■ Defendant argues, however, that much of the analysis in *Batson* is equally applicable to a challenge to the exclusion of blacks on the basis of one's sixth amendment right to a jury drawn from a

cross-section of the community, a right which clearly exists regardless of the defendant's race. Defendant cites two Federal cases for this proposition, *Barber v. Ponte* (1st Cir. 1985), 772 F.2d 982, and *McCray v. Abrams* (2d Cir. 1984), 750 F.2d 1113. Neither case, however, involved a white defendant challenging the use of peremptory challenges to exclude blacks from the jury, and they are not persuasive here. Further, the Illinois Supreme Court has consistently found that excusing black jurors by use of peremptory challenges does not violate the sixth amendment right to a jury drawn from a fair cross-section of the community. *People v. Williams* (1983), 97 Ill. 2d 252, 274-80, 454 N.E.2d 220; see also *People v. Lewis* (1984), 103 Ill. 2d 111, 116-17, 468 N.E.2d 1222; *People v. Payne* (1983), 99 Ill. 2d 135, 138-39, 457 N.E.2d 1202.

The court in *Williams* discussed at length the case of *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, which held that it is fundamental to the sixth amendment right to a jury trial that the selection of a petit jury be from a representative cross-section of the community. (See 419 U.S. 522, 537, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701.) The *Williams* court determined that the *Taylor* holding is limited by its language which states:

> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition [citations]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (419 U.S. 522, 538, 42 L. Ed. 2d 690, 702-03, 95 S. Ct. 692, 702.)

The court in *Williams* concluded that as the *Taylor* concern was a sixth amendment right to a "fair cross section of the community on venires, panels or lists from which jurors are drawn" (419 U.S. 522, 526, 42 L. Ed. 2d 690, 695-96, 95 S. Ct. 692, 696; see *People v. Payne* (1983), 99 Ill. 2d 135, 138, 457 N.E.2d 1202), it did not affect the holding of *Swain v. Alabama* (1965), 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837, that a constitutional violation could not arise unless there was a systematic and purposeful exclusion of blacks because of race from juries in case after case.

■ *Batson* has decidedly changed the holding of *Swain*, but specifically based its decision on equal protection grounds, not on the

sixth amendment right to a jury drawn from a fair cross-section of the community. (*Batson v. Kentucky* (1986), 476 U.S. 79, 84-85 n.4, 90 L. Ed. 2d 69, 79 n.4, 106 S. Ct. 1712, 1716 n.4.) Moreover, in *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758, the Supreme Court refused to extend the fair cross-section requirement applicable to jury panels or venires to petit juries. (476 U.S. 162, 173, 90 L. Ed. 2d 137, 147-48, 106 S. Ct. 1758, 1764-65.) The conclusion of the Illinois Supreme Court that *Taylor* applies only to venires, panels or lists from which jurors are drawn and not the use of peremptory challenges, therefore, remains unaffected by the *Batson* decision. Defendant is correct that the United States Court of Appeals for the Second Circuit reached a different conclusion in *McCray v. Abrams* (2d Cir. 1984), 750 F.2d 1113, and determined that the use of peremptory challenges to exclude blacks from the jury could constitute a violation of a defendant's sixth amendment rights. The holding of the Illinois Supreme Court in *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, however, is binding on the appellate court of this State and on the facts of this case.

■■■ Defendant also maintains that he was denied his sixth amendment right to a jury drawn from a fair cross-section of the community because of the prosecutor's use of peremptory challenges to remove young people under age 30 from the jury. Defendant argues in his initial brief that the prosecution improperly used its peremptory challenges to remove 12 young people who were available and willing to serve on the jury, but concedes in his reply brief that only seven jurors under age 30 were removed by the State by the use of peremptory challenges and that an alternate juror selected was under age 30.

Defendant cites no case authority from any jurisdiction which holds that the use of peremptory challenges to remove jurors under or over a certain age is a violation of the sixth amendment. Defendant further concedes that no cases have determined that young people are a "distinctive" group and acknowledges that the opposite conclusion was reached in *Barber v. Ponte* (1st Cir. 1985), 772 F.2d 982. The court in *Barber* stated that, in order to be a "distinctive group": (1) the group must be defined and limited by some clearly identifiable factor; (2) a common thread or basic similarity in attitude, ideas, or experience must run through the group; and (3) there must be a community of interests among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. (772 F.2d 982, 997.) The court then determined that young people were not such a distinctive group required to be proportionately represented in jury venires, stating

"[u]nless one is prepared to say that there is an affirmative constitutional duty to produce a true cross section on the venire for every imaginable group that exists in our complex society, something which no court has even come close to holding, we should avoid the overwhelming problems and sterile solutions that will result from attempting to subdivide a continuum of ages into 'distinctive groups.' " 772 F.2d 982, 1000.

Defendant relies on a statement in the case, taken out of context, that "the State has no right to deliberately exclude specific classes and groups from juries without some very special reason" (772 F.2d 982, 1000), arguing that the State's use of peremptory challenges here was such a deliberate exclusion. The court, however, was referring to the fact that a State may not *forbid* certain groups from serving on the jury venire. (772 F.2d 982, 1000.) Moreover, defendant's argument regarding the State's use of peremptory challenges to exclude young people from the jury must fail because, as discussed previously, the Illinois Supreme Court has held that the use of peremptory challenges to exclude petit jurors does not violate the sixth amendment right to a jury drawn from a fair cross-section of the community. *People v. Williams* (1983), 97 Ill. 2d 252, 274-80, 454 N.E.2d 220.

■■ Defendant's next contention is that the trial court improperly struck portions of the testimony of Jerry Treece, defendant's father, regarding "time tests" taken by him over the routes the codefendant testified that they took after leaving defendant's apartment to where they disposed of the body and then traveled to Monical's Pizza. During cross-examination, Jerry Treece reveals that he and defense counsel had taken the route described by the codefendant, that he told the defense counsel the mileage and times elapsed, and that defense counsel wrote it down as he told it to him. The notes taken by the defense counsel consisting of three handwritten pages of notations of mileage, speed, time, and routes had not been provided to the prosecution prior to the discovery during cross-examination.

The trial court found the notes constituted scientific tests and, pursuant to Supreme Court Rule 413(c) (107 Ill. 2d R. 413(c)), should have been disclosed to the State in response to the State's pretrial discovery request. The trial court struck Jerry Treece's testimony regarding this evidence, although defendant refused the trial judge's suggestion that he would continue the trial to allow the defense counsel and the prosecutor to conduct this test together. Defendant contends that the notes were not made by a "scientific expert" but constituted defense counsel's work product which was not subject to disclosure under Supreme Court Rule 412(j)(i) (107 Ill. 2d R. 412(j)(i)).

Although the work-product rule was not advanced below and, therefore, is waived (see *People v. Pastorino* (1982), 91 Ill. 2d 178, 192, 435 N.E.2d 1144), nevertheless, we find the notes here clearly do not contain the opinions, theories, or conclusions of the attorney and do not fall within the scope of the protection afforded by the rule. (*People v. Lego* (1987), 116 Ill. 2d 323, 339, 507 N.E.2d 800; see also *People v. Szabo* (1986), 113 Ill. 2d 83, 92, 497 N.E.2d 995.) Far from reflecting the mental processes of the attorney in preparation of defendant's case, the notes are largely recordations of a witness' statements to counsel pertaining to "time tests" being taken.

We need not decide if this is a scientific test requiring disclosure of the notes under Rule 413(c) because their production is authorized under Rule 413(d)(i). This provision provides that the defendant shall provide the prosecution with:

> "the names and last known addresses of persons he intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements, and record of prior criminal convictions known to him." 107 Ill. 2d R. 413(d)(i).

The notes for the most part contain Jerry Treece's oral statements of times and mileage as admittedly recorded by defense counsel. This clearly falls within the discovery provided in Rule 413(d)(i). Although the notes also contain some notations by defense counsel of the routes taken and speeds of Treece's automobile, these additional records are not the attorney's work product, as discussed above, and do not operate to prevent disclosure of the otherwise discoverable parts. Although this was not the basis of the trial court's ruling, we may affirm the trial court when correct for any reason appearing in the record even though its decision may be based on improper reasoning. *People v. Holloway* (1985), 131 Ill. App. 3d 290, 306, 475 N.E.2d 915; *People v. Merz* (1984), 122 Ill. App. 3d 972, 976, 461 N.E.2d 1380.

A court's decision to impose a discovery sanction and exclude evidence pursuant to Supreme Court Rule 415(g) (107 Ill. 2d R. 415(g)) rests within the discretion of the trial judge and will not be disturbed absent a showing of prejudice or surprise. (*People v. Carr* (1986), 149 Ill. App. 3d 918, 929, 501 N.E.2d 241.) We find no abuse of discretion under the circumstances here. Defendant refused an opportunity to conduct the tests again in the presence of the prosecutor when the trial judge stated he would grant a continuance of the trial for this purpose. In addition, the excluded evidence was cumulative as another defense witness, Sheriff Mathy, testified to the distances be-

tween these locations and their approximate travel times.

■■■ Defendant next maintains that the trial court erred by allowing numerous gruesome photographs of the deceased, including autopsy photographs and a photograph of her naked body taken at the murder scene, to be presented to the jury. He argued that allowing the photographs to go to the jury served no valid purpose in the case. We disagree.

The decision as to which evidentiary items, including photographs, should be taken into the jury room rests within the sound discretion of the trial court, whose decision will not be disturbed absent a showing of prejudicial abuse. (*People v. Shum* (1987), 117 Ill. 2d 317, 353.) It has been held that photographic evidence having a natural tendency to establish the facts in controversy is admissible (*People v. Williams* (1983), 97 Ill. 2d 252, 290, 454 N.E.2d 220) and that it is not an abuse of discretion to consider even photographs which may be characterized as "disgusting" (*People v. Lindgren* (1980), 79 Ill. 2d 129, 143, 402 N.E.2d 238) and photographs of the deceased taken before and after an autopsy (*People v. Kubat* (1983), 94 Ill. 2d 437, 494-95, 447 N.E.2d 247). The photographs of the victim here were probative as corroboration of the codefendant's testimony of how the victim was killed and the nature of the sexual assault against her. The photographs also depicted the number and location of the bullet wounds illustrated by the pathologist. We cannot say, under the decisions referred to, that the trial court's ruling was an abuse of discretion.

■■■ Defendant contends generally that sections 12—12 through 12—18 of the Criminal Code of 1961 (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—12 through 12—18), added by Public Act 83—1067, and amended by Public Act 83—1117, effective July 1, 1984, are unconstitutional because the definitions and application of these provisions are so unreasonable as to deny an accused due process of law under both the United States and Illinois constitutions. He argues that the statutes should be found unconstitutional for the same reason a provision of the aggravated arson statute was found unconstitutional in *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676. He asserts that under these statutes "sexual penetration" is punished more severely than "sexual conduct" even though, he argues, "sexual conduct" bears a greater *mens rea* and by definition includes the same physical act.

Defendant did not raise any constitutional challenge to the statutes in the trial court. It is fundamental that the failure to raise the issue of a statute's constitutionality in the trial court is ordinarily a waiver of that issue on review. (*People v. Amerman* (1971), 50 Ill. 2d 196, 197, 279 N.E.2d 353; *People v. Hope* (1986), 142 Ill. App. 3d 171,

173, 491 N.E.2d 785; *People v. Coleman* (1983), 120 Ill. App. 3d 851, 853, 459 N.E.2d 5; see also *People v. Dale* (1986), 112 Ill. 2d 460, 466-67, 493 N.E.2d 1060.) However, where a substantial question of constitutionality is raised which, if sustained, would make void the statute under which the accused was charged and convicted, a reviewing court will decline to apply the waiver rule. (*People v. McNeal* (1983), 120 Ill. App. 3d 625, 627, 458 N.E.2d 630; see *People v. Wagner* (1982), 89 Ill. 2d 308, 311, 433 N.E.2d 267.) Nevertheless, where the same arguments have been raised in other cases and rejected, they no longer present substantial questions of constitutionality. (See *People v. Otis* (1985), 135 Ill. App. 3d 718, 722, 479 N.E.2d 40.) Because the appellate court has previously rejected the same arguments presented here (*People v. Ortiz* (1987), 155 Ill. App. 3d 786, 790-91, 508 N.E.2d 490; *People v. Bartay* (1986), 150 Ill. App. 3d 130, 131-33, 501 N.E.2d 364; *People v. Sephus* (1986), 150 Ill. App. 3d 272, 276-78, 501 N.E.2d 175; *People v. Server* (1986), 148 Ill. App. 3d 888, 901, 499 N.E.2d 1019; *People v. Burmeister* (1986), 147 Ill. App. 3d 218, 221-24, 497 N.E.2d 1212), we conclude that they raise no substantial questions of constitutionality and defendant has waived them.

■■■ Defendant next contends that he was improperly sentenced to extended terms for his convictions for armed robbery, aggravated criminal sexual assault, home invasion, and aggravated kidnapping because he was convicted of the more serious offense of murder and the imposition of an extended-term sentence is authorized under section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)) only for the most serious offense of which a defendant is convicted. Although the issue was not raised at sentencing or at any time below and is waived (*People v. Neal* (1985), 111 Ill. 2d 180, 203, 489 N.E.2d 845), the waiver rule is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in the interest of substantial justice (*People v. Winston* (1982), 106 Ill. App. 3d 673, 688, 435 N.E.2d 1327) or where the sentencing is void. See *People v. McCarty* (1983), 94 Ill. 2d 28, 37, 445 N.E.2d 298.

Section 5—8—2(a) provides, in pertinent part:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

(1) for murder, a term shall be not less than 40 years and not more than 80 years;

(2) for a Class X felony, a term shall be not less than 30 years and not more than 60 years;

(3) for a Class 1 felony, a term shall be not less than 15 years and not more than 30 years ***." Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a).

The supreme court recently determined in *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845, that an extended-term sentence could be imposed for a defendant's armed robbery conviction where the defendant was also convicted of murder and sentenced to death. (111 Ill. 2d 180, 203-05, 489 N.E.2d 845.) The court reasoned that as the defendant was given a death sentence on the murder charge, the extended-term statutory provision was not applicable to that conviction. This was so because "[t]he statute authorizing extended terms refers to and is bottomed on, in a sense, the maximum sentences 'authorized by Section 5—8—1,' to which it refers. That section refers to terms of imprisonment and does not include capital sentences." (111 Ill. 2d 180, 204, 489 N.E.2d 845.) The court held that "the statute allows the imposition of an extended-term sentence of imprisonment for the class of the most serious offense of which the defendant was convicted when defendant was sentenced to a term of years." 111 Ill. 2d 180, 204-05, 489 N.E.2d 845.

The appellate court in *People v. Young* (1987), 152 Ill. App. 3d 361, 504 N.E.2d 115, interpreted *Neal* to also mean that an extended-term sentence could be imposed for an armed robbery conviction when a natural life sentence was imposed on the defendant's murder conviction. (152 Ill. App. 3d 361, 365-66, 504 N.E.2d 115. But see *People v. Kokoraleis* (1987), 154 Ill. App. 3d 519, 528, 507 N.E.2d 146 (where the State conceded that extended-term sentences for the lesser class felonies of rape and aggravated kidnapping should not have been imposed where there was also a natural life sentence for murder, although *People v. Neal* is not discussed).) The court reasoned that because an extended-term sentence was not given on the murder conviction and a sentence of life imprisonment is not a sentence to a term of years, but one for an undetermined length, under the reasoning in *Neal* an extended-term sentence for the less serious crime of aggravated battery was not precluded by the statute. 152 Ill. App. 3d 361, 366, 504 N.E.2d 115.

We disagree with *Young* that the holding in *Neal* can be interpreted to allow an extended-term sentence for a lesser offense where the defendant has also been convicted of the more serious of-

fense of murder and has been sentenced to a natural life sentence. In *Neal*, the defendant was sentenced to death for murder, and, in finding section 5—8—2(a) did not preclude an extended-term sentence for the less serious offense, the court expressly indicated that section 5—8—2(a) "refers to and is bottomed on" the maximum sentences authorized by section 5—8—1, which does not include capital sentences but only refers to terms of imprisonment. (111 Ill. 2d 180, 204, 489 N.E.2d 845.) However, a term of natural life imprisonment for murder is specifically provided for in section 5—8—1(a)(1)(b) where the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Thus, the basis for the decision in *Neal* does not support a similar result here where a death penalty was not imposed.

Moreover, we note that this same factor is one of the aggravating factors listed in section 5—5—3.2 of the Code, to which section 5—8—2(a) refers in authorizing an extended-term sentence. It certainly would be anomalous to interpret section 5—8—2(a) as allowing an extended-term sentence for an offense less serious than murder where a natural life sentence was imposed under section 5—8—1(a)(1)(b) for murder and not allowing an extended-term sentence for the less serious offense where an extended-term sentence for murder is given pursuant to section 5—8—2(a)(1), both being authorized upon a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty.

Further, it is clear from the language of section 5—8—2(a) that when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the *conviction* within the most serious class. (*People v. Jordan* (1984), 103 Ill. 2d 192, 206, 469 N.E.2d 569.) It therefore appears that except where the death penalty is imposed, a sentence not authorized under section 5—8—1, an extended-term sentence can only be imposed for the class of the most serious offense of which the offender is convicted. Here, defendant was convicted of murder, and the death penalty was not imposed, and, therefore, the extended-term sentences for lesser crimes is not authorized under section 5—8—2(a).

While the supreme court in *Neal* used the words "term of years" in its holding, we believe that this was in the context of comparing any sentence of imprisonment, including a natural life sentence, to a death sentence and was not intended to otherwise apply section 5—8—2(a) in the circumstances before us.

For the foregoing reasons, the extended-term sentences for aggravated criminal sexual assault, armed robbery, and home invasion must be reduced. In addition, notwithstanding the reasoning above,

the extended-term sentence for aggravated kidnapping was improperly imposed and also has to be reduced as it is a Class I felony, while the other offenses are Class X felonies, and is not of the class of the most serious offense of which the defendant was convicted. Pursuant to our authority under Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), we reduce the sentences to 30 years each for aggravated criminal sexual assault, armed robbery, and home invasion, and 15 years for aggravated kidnapping, the maximum sentence for the class of each offense.

Defendant's final contention is that his natural life sentence for his murder conviction is unfair considering the fact that his codefendant, William L. Braid, was sentenced to only a 50-year sentence of imprisonment.

 First, defendant has the burden, when arguing disparate sentences, to produce a record upon which a rational comparison can be made. (*People v. Kline* (1982), 92 Ill. 2d 490, 509, 442 N.E.2d 154; *People v. Goble* (1984), 125 Ill. App. 3d 289, 291, 465 N.E.2d 1371.) Defendant here merely asks in his appellate brief that we take judicial notice of the record on appeal and the briefs filed in his codefendant's case currently pending in Third District of the Appellate Court without moving to supplement the record in this case with the pertinent parts of the record sought to be considered. We would be justified in not considering this point on this record.

Even considering defendant's argument, it has no merit. Defendant cites *People v. Cook* (1983), 112 Ill. App. 3d 621, 445 N.E.2d 824, and *People v. Steg* (1966), 69 Ill. App. 2d 188, 215 N.E.2d 854, for the proposition that fundamental fairness and respect for the law require that defendants similarly situated not receive grossly disparate sentences. In those cases, however, the defendants challenging their sentences had not had any greater participation in the crime than their codefendants who received lighter sentences. *People v. Cook* (1983), 112 Ill. App. 3d 621, 623, 445 N.E.2d 824; *People v. Steg* (1969), 69 Ill. App. 2d 188, 190-91, 215 N.E.2d 854.

 The court in *Cook* recognized that a disparate sentence may be supported by either a more serious criminal record or greater participation in the offense. (*People v. Cook* (1983), 112 Ill. App. 3d 621, 623, 445 N.E.2d 824; see *People v. Godinez* (1982), 91 Ill. 2d 47, 55-56, 434 N.E.2d 1121.) Here, the testimony at trial indicated that defendant's participation in the crime of murder was greater as he was the one who actually took the victim from her home, at gunpoint, and fired the gun, killing the victim. While defendant continues to deny involvement, the evidence established his greater participation in

the crime. The jury was convinced of defendant's guilt, showing they were also convinced of the ruthless manner in which he acted. See *People v. Sanchez* (1986), 115 Ill. 2d 238, 276, 503 N.E.2d 277.

 Also, it has been recognized that a codefendant's willingness to cooperate with law enforcement officials investigating criminal activity in which he was a participant and his cooperation in the successful prosecution of other offenders may properly be taken into consideration by the trial court in his sentencing decision. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 105-06, 458 N.E.2d 1370.) Therefore, defendant's more severe sentence is justifiable because he was found to have a greater participation in the crime and because of Braid's cooperation with law enforcement officials and testimony against defendant at trial. It is recognized that a court of review, in considering the appropriateness of punishment, must give great weight to the judgment of the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) Defendant's sentence of natural life for his murder conviction is affirmed.

For the foregoing reasons, defendant's convictions for all the offenses and his natural life sentence for murder are affirmed. The concurrent sentences for the offenses of aggravated criminal sexual assault, armed robbery, and home invasion are reduced to 30 years each, and the sentence for aggravated kidnapping is reduced to 15 years.

Affirmed in part, affirmed and modified in part.

NASH and UNVERZAGT, JJ., concur.